2004 ME 32

**Fred FITANIDES**

v.

**CITY OF SACO et al.**

Supreme Judicial Court of Maine.

Submitted On briefs: Jan. 22, 2004.

Decided: March 8, 2004.

---

Fred Fitanides, Saco, for plaintiff.

Timothy S. Murphy, Esq., Prescott, Lemoine, Jamieson & Nelson, LLC, Saco, for City of Saco.

Christopher L. Vaniotis, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., Portland, for Deshaies and Properties by the Sea, LLC.

Panel: CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CLIFFORD, J.

[¶ 1] Fred Fitanides appeals from a judgment of the Superior Court (York County, *Brennan, J.*), affirming, after consolidating Fitanides's five M.R. Civ. P. 80B appeals, the decisions of the Saco Planning Board and the Saco Zoning Board of Appeals. Fitanides challenges the constitutionality of two "applicability preambles" that precede amendments to the City's zoning ordinance, and contends that the plan proposed by Paul Deshaies and Properties by the Sea, LLC, the developer, does not comply with several zoning requirements. We are unpersuaded by the majority of Fitanides's contentions. We agree, however, with Fitanides that the proposed private road in the project cannot provide the required amount of road frontage because it is located within the boundary lines of Deshaies's lot, and that there is insufficient evidence that the Planning Board waived the through-street requirement in section 10.11.2 of the City's subdivision regulations, and that the proposed private road satisfies the cul-de-sac requirement in section 10.11.5.9.A. Accordingly, we vacate the judgment of the Superior Court and remand with instructions to remand to the Planning Board for further proceedings.

## I. BACKGROUND

[¶ 2] In the fall of 2001, Properties by the Sea, LLC, through its owner, Paul Deshaies, began working on a proposal to develop a lot on Route One in Saco into a condominium project. City officials responded favorably to his proposal, but at that time, the City Council was preparing to amend the City's zoning ordinance; the ordinance, as it was proposed to be amended, would prohibit Deshaies's project from going forward.

[¶ 3] The lot was located in the B–2a zoning district, which permitted residential developments as a conditional use.[1] The zoning ordinance amendments would have rezoned the lot, placing it in the B–6 zoning district, which limits residential development to "[o]ne [s]ingle family dwelling on a lot of record."

[¶ 4] When Deshaies was informed of the impending amendments, he requested that the City Council adopt applicability preambles to grandfather his project from the changes in the zoning ordinance. The City Council accepted Deshaies's request, and the following language was added to two sections of the zoning ordinance:

401–2. APPLICABILITY.

Notwithstanding enactment of these amendments to the Zoning Map, the property identified on the City Assessor's maps as Map 61, Lot 13 and described in a deed recorded in the York County Registry of Deeds at Book 9554 Page 147 shall continue to be governed by the zoning district regulations for the B–2a District in effect on February 19,

---

1. Deshaies's lot is part of a parcel of land originally known as the "Cornforth Farm" property. Deshaies's project proposes to divide the Cornforth property into two lots, with the condominiums on one lot, and the existing Cornforth House on the other.

2002, provided such property is developed as a residential subdivision not exceeding 13 dwelling units in new structures plus any dwelling units and/or bed and breakfast units permissible in existing structures, and further provided that a sketch plan review application under section 4.2 of the City of Saco Subdivision Regulations has been filed on or before February 19, 2002, a complete application for preliminary subdivision approval and any required applications for site plan and/or conditional use approval are submitted within six months after the filing of the sketch plan application, the subdivision is approved within two years of the filing of the sketch plan application, and substantial construction of the subdivision is commenced within two years after approval.

## 809-1. SANITARY WASTE DISPOSAL

Applicability. Notwithstanding anything to the contrary in section 4.1 of the City of Saco Subdivision Regulations, the following amendments shall not apply to any property for which a sketch plan review application for a residential subdivision not to exceed 13 dwelling units in new structures plus any dwelling units and/or bed and breakfast units permissible in existing structures was filed under section 4.2 of the Subdivision Regulations on or before February 19, 2002, provided a complete application for preliminary subdivision approval and any required applications for site plan and/or conditional use approval are submitted within six months after the filing of the sketch plan application, the subdivision is approved within two years of the filing of the sketch plan application, and substantial construction of the subdivision is commenced within two years after approval.

The City Council enacted the amendments, including the preambles, to the City's zoning ordinance on February 19, 2002.

[¶ 5] Deshaies filed site plan, conditional use, and preliminary subdivision applications for the development of thirteen dwelling units with the Planning Board on April 23, 2002. Following public hearings, the Planning Board granted Deshaies site plan, conditional use, and preliminary subdivision approval. Fitanides, whose campground borders the north edge of the property, appealed the site plan approval to the Superior Court pursuant to M.R. Civ. P. 80B, and appealed the conditional use approval to the Zoning Board. The parties agreed to stay the 80B appeal.

[¶ 6] The Zoning Board concluded that the Planning Board erred by including the wetlands area in its calculations, and by not requiring a forty-foot setback between an existing structure and a proposed private road that would serve the new complex. Deshaies then revised the project proposal and reduced the number of units, from thirteen to twelve in six two-family buildings. In August, the Planning Board held a public hearing regarding the revised plan and granted final subdivision approval and a second conditional use permit.

[¶ 7] Fitanides filed a second 80B appeal concerning the final subdivision approval, and appealed the conditional use approval to the Zoning Board. Prior to the hearing before the Zoning Board, Deshaies again modified the plan for the project by lengthening the project's proposed private road. The Planning Board approved this modification. Fitanides appealed this approval to the Superior Court pursuant to M.R. Civ. P. 80B. When the Zoning Board met in October to consider Fitanides's appeal of the August conditional use approval, it concluded that the private road, as it was situated in the August plan, was too close to abutting property.

[¶ 8] Deshaies requested a third conditional use approval and submitted another modification to the plan to the Planning Board, which adjusted the placement of the private road so that it was properly set back from the abutting property. The Planning Board again granted approval. Fitanides appealed the Planning Board's site plan and subdivision approvals to the Superior Court pursuant to M.R. Civ. P. 80B, and appealed the conditional use permit to the Zoning Board. The Zoning Board affirmed the decision of the Planning Board, resulting in final approval of Deshaies's project at the municipal level. Fitanides appealed the Zoning Board's decision to the Superior Court pursuant to M.R. Civ. P. 80B.

[¶ 9] The five 80B appeals were consolidated by the Superior Court. The court affirmed the decisions of the Planning and Zoning Boards, concluding that Fitanides's challenges were without merit, and that the record revealed no errors of law, obvious abuse of discretion, or lack of evidentiary support. Fitanides then filed this appeal from the Superior Court's affirmance of the Planning and Zoning Boards' decisions.

## II.  DISCUSSION

### A.   The Special Legislation Clause

[¶ 10] The constitutionality of the applicability preambles is a question of law that we review de novo. *See City of Bangor v. Diva's, Inc.*, 2003 ME 51, ¶ 10, 830 A.2d 898, 902. Ordinances are presumed constitutional. *Vella v. Town of Camden*, 677 A.2d 1051, 1054 (Me.1996).

[¶ 11] The Special Legislation Clause, ME. CONST. art. IV, pt. 3, § 13, is violated when special legislation is enacted when a general law could have been made applicable. *Brann v. State*, 424 A.2d 699, 704 (Me.1981). Laws that attempt to "exempt one individual from generally applicable requirements of the law" have violated this clause. *Id.*

[¶ 12] Fitanides contends that because the preambles exempt Deshaies from section 4.1 of the Saco subdivision regulations, they violate the Special Legislation Clause. Section 4.1 provides:

> At the request of an applicant, prior to the submission of a plan for preliminary subdivision review, the Planning Board may hold a preapplication workshop to discuss the lot layout, road design, and the format, procedures and process of subdivision review. The preapplication meeting shall not be considered as the commencement of the regular subdivision review process. A plan viewed in preapplication workshop is not considered complete or pending and creates no vested rights for the subdivision review process. The submittal of the preapplication sketch plan shall not be considered the initiation of the review process for the purposes of bringing the plan under the protection of Title 1, M.R.S.A., Subsection 302.

Contrary to the argument of Fitanides, section 4.1 is not a rule of law. Section 4.1 simply provides that neither a preapplication meeting, a preapplication workshop, nor the submission of a preapplication sketch plan, will trigger the protection that 1 M.R.S.A. § 302 (1989) would otherwise provide. Section 302 is considered a rule of construction and not a rule of law. *De-Mello v. Dep't of Envtl. Prot.*, 611 A.2d 985, 986 (Me.1992). Section 4.1, which is premised on section 302, is also a rule of construction. Accordingly, because section 4.1 is not a rule of law, the applicability preambles do not violate the Special Legislation Clause simply because they exempt Deshaies from the provisions of section

4.1.[2]

## B. The Equal Protection Clauses

[¶ 13] Fitanides contends that the applicability preambles violate the Equal Protection Clauses of the Maine and United States Constitutions because they are special laws, granting privileges only to Deshaies. Fitanides must establish that the applicability preambles facially violate equal protection before the City is required to demonstrate a rational basis for the preambles. *Vella*, 677 A.2d at 1054. "The prohibition against denial of equal protection of the law to any person is implicated only when action by the state results in treatment of that person different than that given similarly situated individuals." *Wellman v. Dep't of Human Servs.*, 574 A.2d 879, 883 (Me.1990). Fitanides must demonstrate that, by virtue of the applicability preambles, the Deshaies's lot and project receive treatment different from that given similarly situated lots and projects. *See Begin v. Town of Sabattus*, 409 A.2d 1269, 1276 (Me.1979).

[¶ 14] Fitanides produced no such evidence. Because Fitanides has not met his burden, the presumption of constitutionally controls, and the applicability preambles do not violate the Equal Protection Clauses. *Vella*, 677 A.2d at 1054.

## C. Zoning Ordinance Section 414

[¶ 15] Fitanides contends that the City cannot define Deshaies's project as a multi-family complex because Deshaies's project consists of six two-unit buildings, and, according to Fitanides, multi-family complexes must consist of three or more dwelling units in a single building. Therefore, Fitanides argues section 414 of the zoning ordinance prohibits Deshaies's project because the project proposes more

2. Fitanides also contends that the applicability preambles confer vested rights on Deshaies's project, and therefore conflict with section 4.1 of the City's subdivision regulations because, pursuant to section 4.1, the project could not have vested rights when the zoning amendments were enacted. He contends that because section 4.1 was in effect at the time of the zoning ordinance amendments, pursuant to 30-A M.R.S.A. § 4403(2) (1996), it controls.

Title 30–A M.R.S.A. § 4403(2) states: "The municipal reviewing authority may, after a public hearing, adopt, amend or repeal additional reasonable regulations governing subdivisions which shall control until amended, repealed or replaced by regulations adopted by the municipal legislative body." The purpose of section 4403(2) is to grant a municipal reviewing authority the power to adopt, amend, or repeal subdivision regulations. *See Brown v. Town of Kennebunkport*, 565 A.2d 324, 328 (Me.1989) (discussing 30 M.R.S.A. § 4956(2)(B), section 4403(2)'s predecessor). There is nothing in the language of section 4403(2) that suggests that the section limits the legislative capability of the City Council and therefore, section 4403(2) does not prohibit the City Council from enacting a zoning ordinance more specific than the provisions found in section 4.1.

Moreover, as noted above, section 4.1 is a rule of construction, not a rule of law. Rules of statutory construction may be overridden by clear language evidencing a legislative intent to overcome the general rule. *Bernier v. Data Gen. Corp.*, 2002 ME 2, ¶ 16, 787 A.2d 144, 150. The applicability preamble in section 401–2 of the zoning ordinance clearly expresses the City Council's intent that the Cornforth parcel continue to be governed by the B–2a zoning district provisions, providing certain events occur. The applicability preamble contained in section 809–1 of the zoning ordinance clearly expresses the City Council's intent that the amendments are not to apply to any projects meeting certain specifications. The preamble in 809–1 also specifically refers to section 4.1. *See Bernier*, 2002 ME 2, ¶ 16, 787 A.2d at 150 (stating that one way to override a rule of statutory construction is to explicitly cite the rule). Accordingly, the language in the preambles override section 4.1 and therefore, section 4.1 does not require the Planning Board to review Deshaies's project pursuant to the B–6 zoning regulations.

than one two-family building on a single lot and does not fall into the multi-family complex exception. We disagree.

[¶ 16] Section 414 of the City's zoning ordinance provides that: "No more than one single family or two family dwelling and its accessory buildings as regulated by this Ordinance may be located on any one lot except in the case of multi-family complexes that meet all other applicable sections of the ordinance." A multi-family complex is not defined in the City's zoning ordinance.

[¶ 17] Section 301 of the zoning ordinance provides that when a term is not specifically defined, the term "shall have the meaning implied by [its] context in the Ordinance or [its] ordinarily accepted meaning." *See also George D. Ballard, Builder, Inc. v. City of Westbrook*, 502 A.2d 476, 480 (Me.1985) ("Undefined terms should be given their common and generally accepted meaning unless the context clearly indicates otherwise."). Although a multi-family complex is not defined, a multi-family dwelling is defined in section 302 as: "A building containing three (3) or more dwelling units, such buildings being designed exclusively for residential use and occupancy by three (3) or more families living independently of one another . . . ." The definition of a multi-family dwelling suggests that the term "multi-family" means three or more families. A complex is defined as "an assemblage of units, as buildings or roadways, that together form a single comprehensive group." WEBSTER'S NEW WORLD DICTIONARY 290 (2d ed.1978). Therefore, a multi-family complex is appropriately defined as an assemblage of three or more units that together form a single comprehensive group. Deshaies's project, consisting of twelve single-family units, with each unit's two-car garage abutting one other unit's two-car garage, all posi-

tioned around one cul-de-sac, meets this definition.

[¶ 18] Accordingly, contrary to Fitanides's contention, a multi-family complex is not limited to three or more dwelling units all located in a single building, and because Deshaies's project qualifies as a multi-family complex, it is exempted from section 414 of the zoning ordinance.

## D. Timeliness of Deshaies's Third Conditional Use Application

[¶ 19] Fitanides contends that according to the language of the applicability preambles, any required applications for site plan and/or conditional use approval must be submitted within six months of the date Deshaies filed his sketch plan. He contends that because Deshaies's second and third conditional use applications were untimely filed, Deshaies cannot be grandfathered from the zoning amendments.

[¶ 20] The applicability preambles state that Deshaies's project is grandfathered from the amendments to the zoning ordinance provided that

> a complete application for preliminary subdivision approval and any required applications for site plan and/or conditional use approval are submitted within six months after the filing of the sketch plan application, the subdivision is approved within two years of the filing of the sketch plan application, and substantial construction of the subdivision is commenced within two years after approval.

We agree with Deshaies and the City that the Planning Board was reviewing the same project throughout the entire process. The structure of the applicability preambles suggests that the City Council intended that review of the project should *start* within six months after Deshaies filed his sketch plan application. The City

Council acknowledged that review of the plan might involve appeals, revisions, and further review when it included the provision providing for a two-year review period before the plan must be approved. Concluding otherwise would elevate form over substance. Because Deshaies filed his initial applications for preliminary subdivision, site plan, and conditional use approval within six months of the date he filed his sketch plan review application, his applications were timely filed.

E.   Proposed Private Road's Compliance with the Subdivision Regulations

[¶ 21] Fitanides contends that the proposed private road ends in a dead end and that the Planning Board did not waive the dead end restriction in the City's subdivision regulations. He contends that because the cul-de-sac at the end of the road is not part of the proposed private road, but is actually a driveway, the "through street requirement" of the subdivision regulations has not been met. Fitanides also contends that the subdivision regulation requirement that all streets in a subdivision must be offered for city acceptance has not been complied with because the proposed private road has not been offered for acceptance as a city street. Finally, he contends that the subdivision regulation requirement that all lots in a subdivision must have access from a public street has not been met because the development is accessed via a private road and a private driveway.

[¶ 22] Deshaies contends that even though the subdivision regulations technically apply to his project, conceptually, they were intended to apply to land that is divided into multiple lots served by public streets, not multiple dwelling units on a single lot. Deshaies also contends that any deviance from the subdivision regulations should be construed as a waiver. Finally, Deshaies contends that the private

road was offered for city acceptance, and that the lot does have access to a public road because the lot continues to abut Route One.

[¶ 23] When the Superior Court and the Zoning Board of Appeals act in their appellate capacity, we review the Planning Board's decision directly for an "error of law, abuse of discretion or findings not supported by substantial evidence in the record." *Veilleux v. City of Augusta*, 684 A.2d 413, 415 (Me.1996); *see also Adelman v. Town of Baldwin*, 2000 ME 91, ¶ 8, 750 A.2d 577, 581–82. "Substantial evidence exists if there is any competent evidence in the record to support a decision." *York v. Town of Ogunquit*, 2001 ME 53, ¶ 14, 769 A.2d 172, 178.

[¶ 24] As a preliminary matter, contrary to Deshaies's contention, his project must be reviewed pursuant to the terms of the subdivision regulations. Section 2.2.2 of the regulations state: "The provisions of these regulations shall pertain to all the land proposed for subdivision as defined in Title 30 M.R.S.A., Section 4956, Subsection 1, within the boundaries of the City of Saco." Title 30–A M.R.S.A. § 4401(4) (1996 & Supp.2003) (former 30 M.R.S.A. § 4956) states: "The term 'subdivision' also includes ... the construction or placement of 3 or more dwelling units on a single tract or parcel of land ...." Because Deshaies's project involves twelve dwelling units on a single parcel of land, the provisions of the City's subdivision regulations apply.

1.   The Through–Street Requirement in the Subdivision Regulations

[¶ 25] Section 10.11.2 of the City's subdivision regulations states: "All streets shall be designed as through streets or future through streets unless waived by the Board." Section 12.4 states: "When the

Board grants a waiver to any of the standards in these regulations, the Final Plan shall indicate the waivers granted and the date on which they were granted." Furthermore, section 12.1 of the regulations requires the Planning Board to make "written findings of fact that there are special circumstances" permitting a waiver. The record does not contain a copy of anything labeled a Final Plan, and therefore, we cannot determine whether the Final Plan indicates that the Planning Board waived section 10.11.2.

[¶ 26] Even if the Planning Board did waive section 10.11.2, section 10.11.5.9.A requires that all dead-end streets end in a cul-de-sac that meets certain specifications. There is no evidence in the Planning Board's findings of fact or in the record that the private driveway at the end of the proposed private road meets the specifications outlined in section 10.11.5.9.A. Because the findings of fact are insufficient to determine the Planning Board's decision regarding a waiver, and, if there was a waiver, the basis of that decision, we remand the case to the Superior Court for remand to the Planning Board for further findings of fact. *Carroll v. Town of Rockport*, 2003 ME 135, ¶ 30, 837 A.2d 148, 157.

2. Subdivision Regulation Section 10.11

[¶ 27] Section 10.11 of the subdivision regulations state: "All streets are to be designed to these standards and offered for city acceptance." The Planning Board's findings of fact state: "Said private road and driveway are not submitted nor proposed for future acceptance as a City street."

[¶ 28] Although Deshaies contends that the proposed private road was offered for city acceptance, it is clear from subdivision regulation section 11.25 that, because the proposed private road has not been constructed, it could not have already been offered for city acceptance. The Planning Board's findings of fact indicate that there is no intention of offering the proposed private road for city acceptance, which would violate section 10.11. Nonetheless, because, pursuant to section 11.25, the road cannot be offered until it is built, the issue is not ripe for consideration.

3. Subdivision Regulation Section 10.8

[¶ 29] Section 10.8 of the subdivision regulations state: "All *lots in all* subdivisions shall have access from a public street of the City of Saco." (Emphasis in original.) The language of section 10.8 is satisfied in this situation. Although a private road runs from Route One and ends in a private driveway, there is only one lot, and access to that lot is from Route One.

F. Subdivision Regulation Section 10.6.8

[¶ 30] Fitanides contends that Deshaies's lot violates section 10.6.8 of the City's subdivision regulations because the narrowest point of the lot is approximately eighty feet, which is less than seventy-five percent of two hundred feet, the required amount of lot frontage. Section 10.6.8 of the subdivision regulations states: "Flag lots and other odd shape lots *in which narrow strips are joined to other parcels in order to meet minimum lot size or frontage requirements* are prohibited. The width of a lot at its narrowest point shall not be less than 75 percent of the width of the lot frontage." (Emphasis added.) It is clear that the section does not apply to Deshaies's lot. *See Gerald v. Town of York*, 589 A.2d 1272, 1274 (Me. 1991) ("The terms or expressions in an ordinance are to be construed reasonably with regard to both the objectives sought to be obtained and the general structure of the ordinance as a whole."). This is not the case where "narrow strips [were] joined to other parcels to meet minimum

lot size or frontage requirements." The division of this lot from the original Cornforth Farms parcel simply resulted in a lot shaped somewhat like a flag; no strip of land was added to the lot to meet minimum lot size or frontage requirements. Accordingly, there is no violation of section 10.6.8.

### G. Zoning Ordinance Section 724(7)

[¶ 31] Fitanides contends that, because the private road would reduce the existing frontage along Route One below the required amount of frontage, the project does not comply with section 724(7) of the City's zoning ordinance. Section 724(7) states: "The creation of a private road shall not reduce the frontage, lot area, or other dimensional requirements of an existing conforming lot below that required by the zone in which it is located nor reduce the frontage, lot area, or other dimensional requirements of an existing nonconforming lot." Contrary to Fitanides's contention, the creation of the proposed private road does not reduce the frontage of either the Cornforth House lot or Deshaies's lot. The purpose of the proposed private road is to provide frontage. Although the division of the original parcel into two lots reduced the amount of both lots' frontage on Route One below the required amount, the proposed private road adds to the amount of frontage. Accordingly, the proposed private road does not violate section 724(7) of the City's zoning ordinance.

### H. Required Road Frontage

[¶ 32] Fitanides contends that pursuant to the subdivision regulations, frontage must be measured along a "thoroughfare open to the public," and because the proposed private road is completely contained within Deshaies's parcel, frontage is impermissibly being measured along a driveway.

[¶ 33] There is nothing in the subdivision regulations or in section 724 of the City's zoning ordinance requiring that a private road be owned separately from a lot. Pursuant to section 724, a private road may be constructed to provide frontage for a lot, so long as the private road complies with all of the listed criteria. Fitanides does not contest the proposed private road's compliance with section 724, except for his unpersuasive argument, noted above, that the road violates section 724(7).

[¶ 34] Pursuant to section 302 of the zoning ordinance, frontage is "[t]he linear distance of the continuous line separating the lot from a public road or private road meeting the standards of Section 724, but not including private driveways." Pursuant to section 3.1 of the subdivision regulations, frontage is "[t]he linear distance of the line separating a lot from a publicly or privately maintained thoroughfare open to the public, but not including private driveways." If only these two definitions are considered, frontage is being measured in accordance with the definitions; it is the line separating the lot from the private road.

[¶ 35] Supporting Fitanides's contention are the zoning ordinance's definitions of lot and lot area. A lot is defined in section 302 as "[a] continuous parcel of land in single or joint ownership, described on a deed, plot plan, or similar legal document and having frontage." Lot area is defined in section 302 as "[t]he area of land enclosed within the boundary lines of a lot, minus . . . areas beneath roads serving more than two lots." The project plan shows that the proposed private road is within the boundary line for the Deshaies lot. The proposed private road will serve only two lots, the Cornforth House lot and the Deshaies lot, and therefore, according

to the definitions of lot and lot area, the proposed private road is part of the Deshaies lot. Frontage cannot be measured along the proposed private road because there is no line separating the lot from the road if the road is part of the lot.

[¶ 36] In light of the definitions of lot and lot area, we cannot say that this private road, as currently proposed, can provide the required amount of lot frontage. It is not separated from the lot, and therefore, no continuous line separates the lot from the road.

The entry is:

Judgment vacated. Remanded to the Superior Court with instructions to remand to the Planning Board for further proceedings consistent with this opinion.