2007 ME 102

**SAVE OUR SEBASTICOOK, INC., et al.**

v.

**BOARD OF ENVIRONMENTAL PROTECTION.**

Supreme Judicial Court of Maine.

Argued: Feb. 13, 2007.

Decided: Aug. 7, 2007.

**738**

Anthony Buxton (orally), Todd Griset, Preti, Flaherty, Beliveau & Pachios, Portland, for the appellants.

G. Steven Rowe, Attorney General, Dennis J. Harnish, Assistant Atty. Gen., Gerald D. Reid, Assistant Atty. Gen. (orally), Augusta, for the appellees.

Matthew Manahan (orally), Pierce Atwood, Portland, for FPL Energy.

William Harwood, Nora R. Healy, Verrill Dana, Portland, for Kennebec Coalition.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.*

CLIFFORD, J.

[¶ 1] Save Our Sebasticook, Inc. (SOS), a not-for-profit corporation, appeals from a judgment entered in the Superior Court (Kennebec County, *Studstrup, J.*) affirming a decision of the Board of Environmental Protection, which upheld an order of the Department of Environmental Protection. The Board granted a permit to FPL Energy Maine Hydro LLC for partial removal of the Fort Halifax dam pursuant to the Maine Waterway Development and Conservation Act (MWDCA), 38 M.R.S. §§ 630–637 (2006), and issued a water quality certification in connection with the proposed dam removal pursuant to 38 M.R.S. §§ 464(4)(F), 636(8) (2006). SOS contends that the Board did not comply with the MWDCA because it failed to perform a balancing test and make appropriate findings, and because FPL Energy failed to demonstrate compliance with applicable water quality laws. We disagree and affirm the judgment.

## I. BACKGROUND

[¶ 2] The Fort Halifax dam is a century old hydroelectric dam located in the Town of Winslow on the Sebasticook River. A 417–acre impoundment created by the dam extends upstream for about 5.2 miles, to the Town of Benton.

[¶ 3] In 1986, Central Maine Power Company (CMP), the then owner of the Fort Halifax dam, joined with other hydropower project owners to form the Kennebec Hydro Developers Group (KHDG) to address restoration of anadromous fish[1] to the Kennebec River system. KHDG reached an agreement with the State, whereby the dam owners agreed to provide a total of $1.86 million over a twelve-year period to facilitate fish restoration efforts, and to provide permanent fish passage at their dams according to an established schedule. Pursuant to this agreement, CMP was required to install

---

* Justice Howard H. Dana Jr. sat at oral argument and participated in the initial conference but retired before this opinion was certified.

1. Anadromous fish are those, such as salmon, that spend all or part of their adult lives in salt water and return to fresh water streams and rivers to spawn. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 76 (1981).

permanent upstream fish passage facilities at the Fort Halifax dam by May 1, 1999. The Federal Energy Regulatory Commission (FERC), which regulates all hydropower projects through the Federal Power Act, amended CMP's existing license in January of 1989 to incorporate the terms of the 1986 KHDG agreement.

[¶ 4] In 1991, CMP filed an application with FERC to relicense the Fort Halifax project, without proposing any changes to the existing licensed project. As part of the federal relicensing, by order dated July 26, 1994, the Department granted water quality certification. The Department made findings with respect to future anadromous fish restoration efforts, finding that the 1986 KHDG agreement would be adequate to achieve and maintain water quality standards, and conditioning the order on the dam owner providing fish passage in accordance with the agreement. In November of 1997, FERC issued a new license for the Fort Halifax project, including all of the conditions of the Department's 1994 water quality certification, and requiring CMP to provide funding, studies, and fisheries monitoring in accordance with the 1986 KHDG agreement.

[¶ 5] In 1998, a second agreement was reached and signed by the parties, including KHDG, the State, and the third appellee in this matter, the Kennebec Coalition, a group of fishery advocacy organizations. Under the terms of the 1998 KHDG agreement, the dam owner was required to provide upstream fish passage through a temporary pump and, unless the dam owner had surrendered its FERC license and FERC had ordered the dam to be decommissioned by summer 2003, the dam owner was required to remove the temporary fish pump and install and have fully operational

a permanent lift facility by May 1, 2003. The Department modified its July 26, 1994 water quality certification, and FERC amended the license for the Fort Halifax project to include the fish passage requirements from the 1998 KHDG agreement.

[¶ 6] More than six years after the 1998 agreement was signed, SOS filed an action in the Superior Court seeking a declaration that the 1998 KHDG agreement was void *ab initio,* and that the State's execution of the agreement was a constitutionally-impermissible delegation of its police power. By this time, CMP had transferred the Fort Halifax project to FPL Energy.[2] The Superior Court (Kennebec County, *Studstrup, J.*) entered a judgment dismissing SOS's complaint as untimely, and we affirmed that judgment in a memorandum of decision. *Save Our Sebasticook, Inc. v. Dep't of Marine Res.,* Mem–05–142 (Oct. 12, 2005).

[¶ 7] In 2002, FPL Energy applied to FERC to surrender its license for the Fort Halifax project on the ground that the continued operation of the project under the terms of the existing FERC license and the 1998 KHDG agreement was not economically feasible.

[¶ 8] In May of 2003, in accordance with the National Environmental Policy Act, 42 U.S.C.S. §§ 4321–4375 (LexisNexis 2004 & Supp. 2007), FERC issued a final environmental assessment for the proposed surrender of the license and removal of the dam, analyzing the environmental effects of the proposed surrender and dam removal and of various alternative actions. Based on the comments received from SOS members and other parties adverse to dam removal, FERC issued an order staying the fish passage requirement in the

---

2. The Department approved the transfer of all permits, certifications, condition compliances, and other approvals, and FERC had approved the transfer of the license in December of 1998.

license to allow FPL Energy and the other interested parties to explore fish passage alternatives. Finally, after more public meetings and comments from all interested parties, in January of 2004, FERC approved FPL Energy's application for the surrender of its license for the dam, and authorized partial removal of the dam.

[¶ 9] SOS appealed FERC's decision to the United States Court of Appeals for the District of Columbia Circuit. *Save Our Sebasticook, Inc. v. Fed. Energy Regulatory Comm'n*, 431 F.3d 379 (D.C.Cir.2005). The Court of Appeals found that FERC did not have the authority to consider the validity of the 1998 KHDG agreement in the license surrender proceedings, and dismissed the petition for judicial review in part and denied it in part. *Id.* at 383.

[¶ 10] On August 1, 2002, while the federal action was pending, FPL Energy filed an application for a MWDCA permit and water quality certification with the Department for the partial removal of the dam, the procedure that resulted in the present case. Although the Department did not grant SOS's request to hold a public hearing, it did hold numerous informational meetings and invited written public comment on a draft order. SOS and its members were extensively involved in this process. The Department's final order granting the permit and issuing the certification is thirty-eight pages long and contains twenty-eight pages of factual findings.

[¶ 11] Pursuant to 38 M.R.S. § 344(2–A)(C) (2006), SOS appealed the Department's decision to the Board. The Board issued an eighteen-page decision affirming the Department's order approving FPL Energy's application for a MWDCA permit and water quality certification to partially remove the Fort Halifax dam. In its decision, the Board explicitly adopted the Department's findings of fact and made additional findings of fact after reviewing the materials submitted by SOS and FPL Energy. *See* 38 M.R.S. § 341–D(4) (2006).

[¶ 12] Pursuant to M.R. Civ. P. 80C, 5 M.R.S. § 11002 (2006), and 38 M.R.S. § 346 (2006), SOS appealed the Board's decision to the Superior Court. The Superior Court affirmed the Board's decision. SOS filed this appeal.

## II. DISCUSSION

[¶ 13] SOS contends that the Department and Board improperly construed and applied the provisions of the MWDCA, 38 M.R.S. § 636, in providing a permit to FPL Energy to partially remove the dam. "We review decisions made by an administrative agency for errors of law, abuse of discretion, or findings of fact not supported by the record." *S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶ 4, 868 A.2d 210, 213 *aff'd*, —— U.S. ——, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006). "The administrative agency's interpretation of a statute administered by it, while not conclusive or binding on this [C]ourt, will be given great deference and should be upheld unless the statute plainly compels a contrary result." *Thacker v. Konover Dev. Corp.*, 2003 ME 30, ¶ 14, 818 A.2d 1013, 1019 (quotation marks omitted).

[¶ 14] Any person who seeks to "structurally alter a hydropower project in ways that change water levels or flows above or below the dam," including a person intending to remove a dam, must first obtain a permit to do so from the Department. 38 M.R.S. §§ 633(1), 634(4). In order to receive a permit from the Department, the applicant must demonstrate, and the Department must find, that eight criteria have been met. 38 M.R.S. § 636(1)-(8). SOS challenges the sufficiency of the evidence and the findings with respect to three of the criteria, namely that the pro-

ject will result in significant economic benefits, that the environmental and energy benefits of the project will be greater than the adverse impacts in these areas, and that the project will not violate applicable water quality standards. 38 M.R.S. § 636(3), (7), and (8).

[¶ 15] Pursuant to 38 M.R.S. § 341–D(4)(A) (2006), the Board is not bound by the findings of fact or conclusions of law made by the Department, but may adopt, modify, or reverse those findings.[3] In this case, extensive findings of fact and conclusions of law were initially made by the Department and subsequently adopted by the Board. The Board also made additional findings. We review the Board's own findings in combination with the Department's findings adopted by the Board to determine their sufficiency.

### A. Public Economic Benefits

[¶ 16] SOS argues that the Board, in determining that the economic benefits of the dam removal outweighed the costs, did not adequately consider the public economic benefits criterion as required by 38 M.R.S. § 636(3), because the Board considered only the loss of revenue to the municipality through a decrease in property taxes resulting from changes in the impoundment, without considering the value of the lost hydroelectric energy, the loss of employment, and the purchase of goods and services as required by the Board's regulation. SOS further contends that the Board failed to undertake any quantification using accepted methods to weigh or measure the costs and benefits.

[¶ 17] In order for the Department to issue a permit to remove a dam, it must find that the applicant has demonstrated that "[t]he project will result in significant economic benefits to the public, including, but not limited to, creation of employment opportunities for workers of the State." 38 M.R.S. § 636(3). Pursuant to its rule-making authority under the Administrative Procedure Act, 5 M.R.S. §§ 8051–8064 (2006), the Department has promulgated rules to interpret the MWDCA. Many of the rules are more directly applicable to the building of a new dam, see 3 C.M.R. 06 096 450–5 § (5)(A)(3) (1999), but several sections can be applied to removal of a hydroelectric dam as well. For example, to meet the public benefits criterion, "the applicant must demonstrate that the benefits claimed from the proposed project are real, in that these benefits would not result but for the project. Further, the applicant must demonstrate that the project's economic benefits are greater than it's economic costs, and that the resulting net benefit is significant." *Id.* The rule also prescribes the methods that should be used for measuring economic benefits and costs as follows:

> Economic benefits and costs will be identified and measured using generally accepted methods and procedures, such as those published by the United States Water Resources Council. In accordance with these methods and procedures, economic benefits may include, *but are not limited to*, increases in the income or purchasing power of Maine citizens, energy security from reducing dependence upon fossil fuels, and cre-

---

**3.** Title 38 M.R.S. § 341–D(4)(A) (2006) provides, in part:

The board is not bound by the commissioner's findings of fact or conclusions of law but may adopt, modify, or reverse findings of fact or conclusions of law established by the commissioner. Any changes made by the board under this paragraph must be based upon the board's review of the record, any supplemental evidence admitted by the board and any hearing held by the board.

ation of employment opportunities for workers of the State.

*Id.* (emphasis added).

[¶ 18] SOS argues that the Board failed to consider employment opportunities, income and purchasing power, and energy security as required by the regulation. Those factors are not the only ones that the Board may consider. The Board's findings address a number of factors, including employment opportunities, such as commercial fishing and short-term construction; costs to the public from public roads, bridges, and a public sewer line; and impact on property values. There is no specific evidence in the record dealing with energy prices, but the Board found that the decrease in hydropower generating capacity was small by comparison with the other public benefits.

[¶ 19] SOS further asserts that the Board did not follow its regulations in using "generally accepted methods" to quantify and weigh or measure the costs and benefits, arguing that its finding is "unlawful, unsupported in the record, arbitrary and capricious and a violation of the State law." SOS, however, does not specify what "generally accepted methods" are, or in what way the Board violated these methods. Furthermore, neither the statute nor the Board's regulations require a

specific quantification of economic benefits and costs. Rather, the Board is required to consider and balance these benefits and costs, which the decision of the Board reflects has been done. We cannot say that the Board did not properly interpret and apply its own regulations in determining that the economic benefits of the removal of the dam outweigh the costs.

B. Balancing of Environmental and Energy Considerations

[¶ 20] SOS also contends that the Board failed to quantify or value the benefits and impacts of dam removal on the environment and energy in any systematic or consistent manner, and that the Board's conclusion is not based on all of the criteria set out in section 636(7).

[¶ 21] The Board may approve a permit pursuant to the MWDCA when the applicant demonstrates that "[t]he advantages of the project are greater than the direct and cumulative adverse impacts over the life of the project based upon [six delineated] considerations." 38 M.R.S. § 636(7).[4] Pursuant to section 636(7), the Department must "make a written finding of fact with respect to the nature and magnitude of the impact of the project on each of the considerations ... and a written explana-

4. The criteria under 38 M.R.S. § 636(7) (2006) are as follows:

> A. Whether the project will result in significant benefit or harm to soil stability, coastal and inland wetlands or the natural environment of any surface waters and their shorelands;
> B. Whether the project will result in significant benefit or harm to fish and wildlife resources. In making its determination, the department shall consider other existing uses of the watershed and fisheries management plans adopted by the Department of Inland Fisheries and Wildlife, the Department of Marine Resources and the Atlantic Salmon Commission;

> C. Whether the project will result in significant benefit or harm to historic and archeological resources;
> D. Whether the project will result in significant benefit or harm to the public rights of access to and use of the surface waters of the state for navigation, fishing, fowling, recreation and other lawful public uses;
> E. Whether the project will result in significant flood control benefits or flood hazards; and
> F. Whether the project will result in significant hydroelectric energy benefits, including the increase in generating capacity and annual energy output resulting from the project, and the amount of nonrenewable fuels it would replace.

tion of their use of these findings in reaching their decision." 38 M.R.S. § 636(7). The applicable agency regulation states: "Determining whether the advantages of the project are greater than it[ ]s adverse impact requires attaching values or weight to the project's various benefits and harms." 3 C.M.R. 06 096 450–7 § (5)(A)(8)(A) (1999).

[¶ 22] When, as here, the statute specifically states that the agency must "make a written finding of fact with respect to the nature and magnitude of the impact of the project on each of the considerations ... and a written explanation of their use of these findings in reaching their decision," 38 M.R.S. § 636(7), we review the adequacy of the findings as a matter of law. *See Chapel Rd. Assocs., L.L.C. v. Town of Wells,* 2001 ME 178, ¶¶ 11–12, 787 A.2d 137, 140.

1. Soil Stability and Wetlands, Section 636(7)(A)

[¶ 23] The Board and Department each made a number of findings with respect to soil stability and wetlands. The Board found as follows.

> The evidence in the record indicates that, while there will be some bank erosion and sediment movement following dam removal, as the river re-establishes its natural channel, this erosion and sedimentation will not be significant. The evidence in the record further indicates that both FERC and the [Army] Corps [of Engineers] have also concluded that soil erosion and sedimentation will not be a significant issue. Finally, the evidence in the record indicates that the measures required by the Department will be sufficient to ensure that erosion and sedimentation from bank erosion and slumping are adequately controlled.

The Board further found that "while the relative proportion of wetland types will change following dam removal, the overall amount of wetlands will not change significantly." Although there is contrary evidence in the record, the Board made sufficient findings, and there is enough evidence in the record to support those findings regarding soil stability and wetlands.

2. Fish and Wildlife Resources, Section 636(7)(B)

[¶ 24] The Board adopted the Department's findings on fish and wildlife resources. The Department of Inland Fisheries and Wildlife commented to the Department that it did not oppose the proposed dam removal, and it recommended an incidental take plan to protect threatened mussel species. The Board's findings and conclusions addressed the incidental take plan as well as habitat for bald eagles. The findings with respect to fish and wildlife resources are sufficient, and are supported in the record.

3. Historic and Archeological Resources, Section 636(7)(C)

[¶ 25] In its appeal to the Board, SOS did not specifically challenge the Department's findings with respect to historical and archeological resources, and therefore, any issue as to these findings is unpreserved. *See New England Whitewater Ctr., Inc. v. Dep't of Inland Fisheries & Wildlife,* 550 A.2d 56, 58 (Me.1988).

4. Public Access, Section 636(7)(D)

[¶ 26] The Board's findings as to public access reflect a balancing of lost recreational opportunities with newly created opportunities. Although some of the access may be across private lands, FPL Energy agreed to keep public access available at the site. We cannot say that those findings are legally insufficient or unsupported in the record.

### 5. Flood Control, Section 636(7)(E)

[¶ 27] In its appeal of the Department's decision to the Board, SOS argued that the Department's order was silent on the issue of flood control. The Department, however, did make findings with respect to flood control. Flood control was a significant issue in the FERC and Army Corps of Engineering licensing processes, and the Army Corps conducted studies that are part of the present record. The findings of the Department, adopted by the Board, weighing flood control considerations are adequate and are supported in the record.

### 6. Hydroelectric Power, Section 636(7)(F)

[¶ 28] SOS argues that the Board made inadequate findings with respect to hydro-electric power generation. The Department and the Board both made findings with respect to hydropower generation, and the generating capacity of the dam and concluded that "the proposed partial removal of the dam will result in only a small decrease in hydropower generating capacity and annual energy output in the State." Notably, the State Planning Office stated in its comments on the partial removal of the dam that the energy loss is "not significant from a statewide energy perspective." We cannot say that these findings are not supported in the record.

[¶ 29] Finally, although the Board did not assign a specific "value" to each of the considerations discussed above, the Board and Department used language weighing each consideration, and concluded that the dam removal would not have an overall significant negative impact on the environmental and energy considerations. The Board properly balanced the section 636(7) criteria in determining that the advantages of the project are greater than the direct and cumulative adverse impacts.

### C. Water Quality Certification

 [¶ 30] SOS also contends that FPL Energy has not demonstrated compliance with applicable water quality laws as required pursuant to section 636(8), and that the Board did not make adequate findings with respect to the State's antidegradation policy, which is part of the water quality certification.

[¶ 31] Pursuant to the MWDCA, the applicant must demonstrate, and the Department must find, that "[t]here is reasonable assurance that the project will not violate applicable state water quality standards, including the provisions of section 464, subsection 4, paragraph F, as required for water quality certification under the United States Water Pollution Control Act, Section 401." 38 M.R.S. § 636(8).[5] Section 464(4)(F) contains the State's antidegradation policy, which is at issue on this appeal.

[¶ 32] The antidegradation policy states in pertinent part:

(1) Existing in-stream water uses and the level of water quality necessary to protect those existing uses must be maintained and protected. Existing in-stream water uses are those uses which have actually occurred on or after November 28, 1975, in or on a water body whether or not the uses are included in the standard for classification of the particular water body.

Determinations of what constitutes an existing in-stream water use on a particular water body must be made on a case-by-case basis by the department. In making its determination of uses to

---

**5.** SOS does not raise any issues with respect to section 401 of the federal Water Pollution Control Act.

be protected and maintained, the department shall consider designated uses for that water body and:

**(a)** Aquatic, estuarine and marine life present in the water body;

**(b)** Wildlife that utilize the water body;

**(c)** Habitat, including significant wetlands, within a water body supporting existing populations of wildlife or aquatic, estuarine or marine life, or plant life that is maintained by the water body; [and]

**(d)** The use of the water body for recreation in or on the water, fishing, water supply, or commercial activity that depends directly on the preservation of an existing level of water quality. Use of the water body to receive or transport waste water discharges is not considered an existing use for purposes of this antidegradation policy.

38 M.R.S. § 464(4)(F)(1)(a)-(d).

[¶ 33] SOS asserts that an existing, designated use of the impoundment as the habitat for two State-listed threatened types of freshwater mussels will be impermissibly eliminated by the dam removal. SOS further argues that other existing instream uses must be maintained and protected, including commercial use by guides for bass fishing, recreational use by powerboats and snowmobiles, and hydroelectric power generation.

[¶ 34] In its decision, the Department made findings with respect to existing and designated uses, concluding that "there is a reasonable assurance that the project will not violate applicable State water quality standards, provided that the project is undertaken in accordance with the provisions of Conclusion # 6." In its conclusion number six, the Department noted that the incidental take plan must be "implemented to identify, collect, and relocate any state-listed freshwater mussels in the impoundment area that is dewatered by the remov-

al of the dam." The Board found as follows:

Contrary to the appellants' assertions, the designated uses of the river in the project area for recreation in and on the water, for fishing, and as habitat for wildlife aquatic life will not be eliminated or even significantly diminished by the removal of the dam. Rather, these uses will simply be changed from those associated with an impoundment. The evidence in the record indicates that the removal of the dam will not impair the viability of any existing population of wildlife or aquatic life nor significantly degrade the use of the river for recreation or fishing. All existing wildlife and aquatic life, as well as fishing and other recreational uses, will continue to exist, albeit in different quantity or form, following dam removal. In addition, habitat and access for various indigenous species of fish will be improved as a result of dam removal.

As the Board correctly notes, if SOS's interpretation of the antidegradation policy were to be adopted, then no existing use could ever be limited, and no dam could ever be removed, because portions of habitat for certain types of species would always be destroyed, and certain recreational uses would always be changed, as would the use of current hydroelectric power generators. The Board's conclusion that the overall water quality would improve, that there is a plan to move those species whose habitat would be harmed by the removal to another suitable habitat, and the habitat for a great number of other species would be improved, is supported by evidence in the record.

[¶ 35] An interpretation of the water quality certification that requires the Department always to maintain current uses is also contrary to the Legislature's policy classifying the waters of Maine: "The Leg-

islature declares that it is the State's objective to *restore* and maintain the chemical, physical and biological integrity of the State's waters and to preserve certain pristine state waters." 38 M.R.S. § 464(1) (2006) (emphasis added). The Board made all the necessary findings with respect to designated and existing uses under Maine's antidegradation policy, supporting its decision as to water quality certification.

The entry is:

Judgment affirmed.