2010 ME 18

**FRIENDS OF LINCOLN LAKES et al.**

v.

**BOARD OF ENVIRONMENTAL PROTECTION et al.**

Supreme Judicial Court of Maine.

Argued: Feb. 10, 2010.
Decided: March 11, 2010.

Lynne Williams, Esq. (orally), Bar Harbor, ME, for the Friends of Lincoln Lakes.

Janet T. Mills, Attorney General, Margaret Bensinger, Asst. Atty. Gen. (orally), Amy Mills, Asst. Atty. Gen., Augusta, ME, for the Board of Environmental Protection.

Juliet T. Browne, Esq. (orally), Scott D. Anderson, Esq., Gordon R. Smith, Esq., Verrill Dana, LLP, Portland, ME, for Evergreen Wind Power III, LLC.

Sean Mahoney, Esq., Conservation Law Foundation, Portland, ME, for amicus curiae Conservation Law Foundation.

Rufus E. Brown, Esq., Brown & Burke, Portland, ME, for amicus curiae Concerned Citizens to Save Roxbury.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

ALEXANDER, J.

[¶ 1]   The Friends of Lincoln Lakes, a Maine nonprofit corporation, and certain individuals (collectively "FOLL") appeal,[1] pursuant to 38 M.R.S. § 346(4) (2009), from a decision of the Board of Environmental Protection (Board) which affirmed an order of the Department of Environmental Protection (Department) approving the issuance of permits to Evergreen Wind Power III, LLC, to construct a wind energy generation facility.  FOLL argues that: (1) the Board's findings that Evergreen met applicable licensing criteria with respect to sound level limits, impact on public health, and minimized impact on wildlife habitats are unsupported by substantial evidence in the record;  and (2) 38 M.R.S. §§ 344(2–A)(A)(1), 346(4) (2009), precluding the Board from assuming jurisdiction

---

1.  Because Friends of Lincoln Lakes appears to represent individuals who will be impacted by construction of the wind energy generation facility, and there is no dispute that the individual plaintiffs have standing, the corporation may bring this appeal.  *See generally In re Int'l Paper Co., Androscoggin Mill Expansion,* 363 A.2d 235, 238–39 (Me.1976).

of Evergreen's permit applications and allowing direct appeal from the Board to this Court, violate the Equal Protection Clauses of the United States and Maine Constitutions. We affirm the decision of the Board.

## I. CASE HISTORY

[¶ 2] In October 2008, Evergreen Wind Power III, LLC, filed applications with the Department for permits, pursuant to the Site Location of Development Law, 38 M.R.S. §§ 481–490 (2008) (the Site Law), and the Natural Resources Protection Act, 38 M.R.S. §§ 480–A to 480–GG (2008) (the NRPA), to construct the Rollins Wind Project in the Towns of Lincoln, Lee, Winn, Burlington, and Mattawamkeag.[2] The Rollins Project is a proposed sixty-megawatt wind energy generation facility, including forty wind turbines, each 389 feet high, to be located atop northern and southern ridges on Rollins Mountain. The Rollins Project is an "expedited wind energy development," which is statutorily defined to mean "a grid-scale wind energy development that is proposed for location within an expedited permitting area." 35–A M.R.S. § 3451(4) (2009).

[¶ 3] The Evergreen application included a "Sound Level Assessment," completed by an engineering company, that is intended to predict sound levels generated by operation of the Rollins Project and to evaluate compliance with sound level limits established in the Department rules. The study was conducted using an acoustic model that employed the CADNA/A software program.[3] The model treated the wind turbines as point sources of sound, as opposed to line sources.

[¶ 4] Based on predictions of sound attenuation traveling from the turbines to five "protected locations" in the vicinity of the Rollins Project deemed to have the greatest potential for exceeding applicable sound level limits, the sound level assessment concluded that the hourly sound levels generated at these five protected locations, taking into consideration an additional five dBA and other conservative factors, would not exceed the maximum nighttime noise limit of forty-five dBA established in Department rules, 2 C.M.R. 06 096 375–7 § 10(C)(1)(a)(v) (2001), for so-called "quiet locations."[4]

[¶ 5] An independent peer reviewer retained by the Department initially expressed some reservations about the model used for the sound assessment, but after meeting with Evergreen representatives, he ultimately concluded that the sound assessment was "essentially reasonable and technically correct according to standard engineering practices." He stated that the five protected location sites tested for sound levels were appropriate in number and location and that it was reasonable to estimate that the Rollins Project would typically produce thirty-nine to forty-five dBA sound levels at the location sites, though he noted that actual noise levels could vary based on a variety of factors.

---

2. Certain provisions of the Site Law and NRPA were subsequently enacted or amended by P.L. 2009, ch. 75, §§ 1–5; ch. 293, §§ 1–4; ch. 295, § 1; ch. 460, §§ 1, 2 (effective Sept. 12, 2009); and P.L. 2009, ch. 270, § A–2 (effective June 4, 2009).

3. The CADNA/A, "computer aided noise abatement," software program was used to develop an acoustic model to map area terrain in three dimensions, to locate the pro-posed turbines, and to calculate outdoor sound from the turbines.

4. A "protected location" is defined in part as "[a]ny location, accessible by foot, on a parcel of land containing a residence ... or approved residential subdivision ... near the development site...." 2 C.M.R. 06 096 375–11 § 10(G)(16) (2001). "dBA" refers to "A-weighted" decibels, a measure of sound pressure level and of acoustics.

[¶ 6] The consultant observed that the acoustic model using CADNA/A software did not, however, account for "potential excessive amplitude modulation," which could result in short duration repetitive (SDR) sounds at certain of the protected locations under certain conditions. Because SDR sounds could occur, which would invoke a five dBA penalty, pursuant to 2 C.M.R. 06 096 375–8 § 10(C)(1)(e) (2001), and cause the Rollins Project to become non-compliant at certain protected locations, Evergreen submitted, at the consultant's suggestion, a compliance assessment plan to ensure that the forty-five dBA limit is met under all operating conditions.

[¶ 7] Evergreen's application also included studies evaluating the effect of the Rollins Project on wildlife habitats in areas surrounding the proposed site. The application acknowledged that, according to the Maine Department of Inland Fisheries and Wildlife (MDIFW), eight bald eagle nests had been mapped within five miles of the proposed site, including one nest approximately one mile from the proposed site, but none within the proposed project area. Evergreen asserted in its application that the Rollins Project would not pose a significant threat to birds, bats, or raptors (including eagles). MDIFW expressed concerns about the impact of the Rollins Project on bird, bat, and raptor mortality. MDIFW also acknowledged the potential negative impact on the eagles nesting one mile from the proposed site, given the proximity of that nest to the project site and the eagles' use of ridgelines to catch updrafts for soaring. MDIFW suggested that, in response to this potential for adverse impacts, Evergreen be required to conduct post-construction mortality studies to determine the project's impacts on these species and to determine ways to offset negative impacts.

[¶ 8] After Evergreen submitted its application, the Department denied multiple requests from the public for a public hearing and requests that the Board assume jurisdiction of the matter, citing 38 M.R.S. § 344(2–A)(A)(1), which statutorily precludes the Commissioner from requesting that the Board assume jurisdiction over expedited wind energy development applications. The Department did hold a public meeting on February 11, 2009, to allow interested parties to comment on the application and submit information. FOLL participated at this meeting, submitting verbal and written comments, studies, and articles disputing the appropriateness of the model used to assess predicted sound levels; raising concerns about the public health impact from wind turbine noise due to infrasound (sound less than twenty Hz, generally considered the normal limit of human hearing) and low-frequency sound less than 250 Hz; and asserting that the proposed project would have an adverse impact on wildlife.[5]

[¶ 9] The Department solicited comments from numerous state and federal agencies on the issues raised in the application and at the public meeting, including opinions from the Maine Centers for Disease Control (MCDC) concerning the impact of wind turbine noise on public health. The MCDC concluded, based on its review of various studies and guidelines, that the noise level expected to be generated by the Rollins Project would not result in hearing loss or sleep disturbance and that it had found no evidence of adverse health effects resulting from the noise levels and low-frequency and infrasound vibrations predicted, other than occasional annoyance.

[¶ 10] The Department approved Evergreen's application in April 2009 in a fifty-

5. 5 "Hz" refers to "hertz," a unit of frequency.

one-page order, contingent on a multitude of conditions including Evergreen's implementation of its sound level compliance assessment plan and its post-construction monitoring of area wildlife habitats in consultation with the Department and MDIFW. The Department's order specified that if post-construction monitoring indicates that the project does not comply with sound level limits, Evergreen will be required to submit a revised protocol showing that sound level limits will be met. Similarly, if post-construction monitoring studies reveal that the project is having an unreasonable adverse impact on wildlife, Evergreen will be required to "implement appropriate and practical measures for avoiding and/or minimizing continued impacts."

[¶ 11] FOLL appealed the Department's decision to the Board. The Board denied FOLL's request for a public hearing. Taking no additional evidence, but making findings regarding the issues FOLL raised concerning noise and wildlife impacts from the Rollins Project, the Board issued a decision in August 2009 affirming the Department's approval of Evergreen's application. The Board found that Evergreen demonstrated that the Rollins Project can be constructed in compliance with applicable noise level limits, provided that it accounts for potential SDR sounds through the implementation of its post-construction compliance assessment methodology. The Board also found that Evergreen had demonstrated that the Rollins Project "will not unreasonably harm bald eagles or other wildlife" in accordance with Department rules and with the NRPA, 38 M.R.S. § 480–D(3). The

Board based this finding in large part on Evergreen's application and MDIFW's review. The Board did not expressly find that noise levels from the project will not adversely affect public health, but recited evidence submitted by the independent consultant and MCDC to that effect. FOLL appeals from the Board's decision.

## II.  LEGAL ANALYSIS

A.  Sufficiency of the Evidence to Support the Approval

1.  Standard of Review

■■ [¶ 12] Respecting our constitutional separation of powers, Me. Const. art. III, and statutes governing administrative appeals, our review of state agency decision-making is deferential and limited. "We review decisions made by an administrative agency for errors of law, abuse of discretion, or findings of fact not supported by the record." *Save Our Sebasticook, Inc. v. Bd. of Envtl. Prot.*, 2007 ME 102, ¶ 13, 928 A.2d 736, 740 (quotation marks omitted). In this review, "[t]he [C]ourt shall not substitute its judgment for that of the agency on questions of fact." 5 M.R.S. § 11007(3) (2009).

■■ [¶ 13] Upon review of an agency's findings of fact we must examine "the entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did." *Int'l Paper Co. v. Bd. of Envtl. Prot.*, 1999 ME 135, ¶ 29, 737 A.2d 1047, 1054. We must affirm findings of fact if they are supported by substantial evidence in the record, even if the record contains inconsistent evidence or evidence contrary to the result reached by the agency.[6] *S.D. Warren Co. v. Bd. of*

---

6. For purposes of our decision, we assume, without deciding, that the information presented at the public meeting and other communications received by the Department and the Board during the course of consideration of the Evergreen application are part of the administrative record upon which the decision could be based. *See* 5 M.R.S. § 9059 (2009) (addressing the nature and contents of a record of an adjudicatory proceeding).

*Envtl. Prot.,* 2005 ME 27, ¶ 22 n. 10, 868 A.2d 210, 218; *Int'l Paper Co.,* 1999 ME 135, ¶ 29, 737 A.2d at 1054; *Aviation Oil Co. v. Dep't of Envtl. Prot.,* 584 A.2d 611, 614 (Me.1990).

[¶ 14] The "substantial evidence" standard does not involve any weighing of the merits of evidence. Instead it requires us to determine whether there is any competent evidence in the record to support a finding. Administrative agency findings of fact will be vacated only if there is no competent evidence in the record to support a decision. *Lakeside at Pleasant Mountain Condo. Ass'n v. Town of Bridgton,* 2009 ME 64, ¶ 11, 974 A.2d 893, 896; *Fitanides v. City of Saco,* 2004 ME 32, ¶ 23, 843 A.2d 8, 15; *see also Green v. Comm'r of Dep't of Mental Health,* 2001 ME 86, ¶ 9, 776 A.2d 612, 615 (noting that review is based on "clearly erroneous" standards); 5 M.R.S. § 11007(3). Any Court review that would redecide the weight and significance given the evidence by the administrative agency would lead to ad hoc judicial decision-making, without giving due regard to the agency's expertise, and would exceed our statutory authority.

[¶ 15] Accordingly, we proceed to review the findings of the Board to determine their sufficiency. *See Save Our Sebasticook,* 2007 ME 102, ¶ 15, 928 A.2d at 741; *FPL Energy Me. Hydro LLC v. Dep't of Envtl. Prot.,* 2007 ME 97, ¶ 14, 926 A.2d 1197, 1201. In this review, FOLL, the party seeking to vacate the agency decision, bears the burden of persuasion on appeal. *Anderson v. Me. Pub. Employees Ret. Sys.,* 2009 ME 134, ¶ 3, 985 A.2d 501, 503; *Zegel v. Bd. of Soc. Worker Licensure,* 2004 ME 31, ¶ 14, 843 A.2d 18, 22.

2. Record Evidence

[¶ 16] FOLL essentially conceded at oral argument that the Board's findings are supported by substantial evidence in the record. The nature of FOLL's sufficiency of the evidence argument appears to be that findings resulting in a denial of the application could have been supported by evidence in the record questioning the propriety of the sound assessment model, suggesting significant impact of wind turbine sounds and vibrations on public health, and warning of the project's impact on wildlife. Given the standard of review that we are bound to apply, however, whether alternative findings could be supported by the record is not determinative. *See S.D. Warren Co.,* 2005 ME 27, ¶ 22 n. 10, 868 A.2d at 218.

[¶ 17] Reviewing the record as a whole, and notwithstanding the fact that evidence or information exists in the record that could support alternative findings, the Board's factual findings are supported by substantial evidence in the record, based on the final reports of the Department's independent consultant, the sound assessment study, and the opinions of the MDIFW and MCDC. We briefly address each of FOLL's main points.

a. Sound Level Assessment

[¶ 18] Title 38 M.R.S. § 484(3)(B) provides that "[i]n determining whether. a developer has made adequate provision for the control of noise generated by a commercial or industrial development, the department shall consider board rules relating to noise...." Pursuant to regulations, as relevant to the Rollins Project, the hourly sound levels resulting from the routine operation of the development may not exceed fifty-five dBA during the day and forty-five dBA at night. 2 C.M.R. 06 096 375–7 § 10(C)(1)(a)(v) (2001). Five dBA must be added to observed levels of short duration repetitive sounds that result from routine operation of the development for purposes of determining compliance with the above sound level limit. 2 C.M.R. 06 096 375–8 § 10(C)(1)(e) (2001).

[¶ 19] As FOLL argues, the sound prediction model, CADNA/A (operating in ISO 9613–2) may not be designed specifically for wind turbine projects. The Department consultant ultimately concluded, however, that the sound assessment was "essentially reasonable and technically correct," except for its failure to consider the potential for SDR sounds. The consultant's recommendation that the project be monitored post-construction for SDR sounds and compliance with sound level limits was adopted. *See* 2 C.M.R. 06 096 375–10 § 10(E) (2001).[7] FOLL did not offer an alternative sound prediction model, and the Board could conclude that FOLL failed to demonstrate that the use of the CADNA/A model was unreasonable or inappropriate.[8]

### b. Public Health

[¶ 20] Department rules state that "[t]he Board recognizes that the construction, operation and maintenance of developments may cause excessive noise that could degrade the health and welfare of nearby neighbors," and that it is the Board's intent "to require adequate provision for the control of excessive environmental noise from developments." 2 C.M.R. 06 096 375–6 § 10(A) (2001). The Board's inferred determination concerning the impact of wind energy sound and vibrations on public health is supported by the opinion of the MCDC included in the record, upon which the Board could reasonably rely. We cannot reject the Board's finding on the grounds that other evidence in the record supports a different factual finding. *See Aviation Oil Co.*, 584 A.2d at 614.

### c. Wildlife

[¶ 21] The NRPA provides that a person must obtain a permit from the Department before beginning construction "if the activity is located in, on or over any protected natural resource," which includes a "significant wildlife habitat." 38 M.R.S. §§ 480–B(8), 480–C(1). A "significant wildlife habitat" includes habitats of species appearing on the State list of threatened species.[9] 38 M.R.S. § 480–

7. Department rules provide:
   The Board may, as a term or condition of approval, establish any reasonable requirement to ensure that the developer has made adequate provision for the control of noise from the development and to reduce the impact of noise on protected locations. Such conditions may include, but are not limited to, ... requiring the employment of specific design technologies, site design, modes of operation, or traffic patterns.
   2 C.M.R. 06 096 375–10 § 10(E) (2001).

8. FOLL argues that the Board should not have relied on the sound assessment because it calculated sound using point source rather than line source methods. We do not find precise support for the Board's finding that the Department's consultant stated that "the difference between point source analysis and line source analysis is insignificant, therefore, the point source method has been appropriately used by [Evergreen] in the assessment study." This factual finding may have been based on a statement made by the Department in a question and answer sheet summarizing the evidence, but we have not found substantial evidence in the record showing that the consultant made or agreed with this statement. However, the record indicates that the consultant reportedly observed at one point that turbines are something "in between" point source and line source. Additionally, the consultant stated generally that the sound assessment study was "technically correct." We conclude that the Board's finding as to line source versus point source assessment, if not expressly supported in the record, is inferentially supported in the record.

9. As stated in the record, the bald eagle was listed as a "threatened" species in Maine. The bald eagle was "delisted" from the State list of threatened species effective September 12, 2009. *See* 12 M.R.S. §§ 12803(3)(U), 12810(1) (2009) (as repealed and enacted, re-

B(10). Before being granted a permit, the applicant must show that the activity proposed "will not unreasonably harm any significant wildlife habitat ... [or] travel corridor." 38 M.R.S. § 480–D(3).

[¶ 22] Agency rules provide that "[e]ven if the activity has no practicable alternative, and the applicant has minimized the proposed alteration as much as possible, the application will be denied if the activity will have an unreasonable impact on ... subject wildlife." 2 C.M.R. 06 096 335–2 § 3(C) (2010). An "unreasonable impact" means "that one or more of the standards of the NRPA at 38 M.R.S.[ ] § 480–D will not be met." *Id.* In making this determination, the Department "considers the area of the significant wildlife habitat affected by the activity, including areas beyond the physical boundaries of the project and the cumulative effects of frequent minor alterations of significant wildlife habitats." *Id.*

[¶ 23] Contrary to FOLL's contention, the Board did consider the impact of the project on area wildlife for purposes of the NRPA, finding that the project as proposed will not have an unreasonable impact on significant wildlife habitats under its rules and the NRPA and requiring that post-construction monitoring be performed to determine, avoid, and minimize negative impact. *See* 38 M.R.S. § 480–D(3); 2 C.M.R. 06 096 335–2 § 3(C) (2010). The Board reasonably relied on the opinion of the MDIFW included in the record which, though acknowledging that certain wildlife, particularly nesting eagles outside the project area, could be negatively impacted by the project, ultimately advised only that the project be monitored post-construction. FOLL has not demonstrated that there is no competent evidence to support the Board's findings. *See Kelley v. Me. Pub. Employees Ret. Sys.,* 2009 ME 27, ¶ 27, 967 A.2d 676, 685.

spectively, by P.L. 2009, ch. 60, § 1, 2 (effec-

[¶ 24] Having reviewed the "entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did," *Int'l Paper Co.,* 1999 ME 135, ¶ 29, 737 A.2d at 1054, we affirm the Board's factual findings as supported by competent record evidence.

### B. Equal Protection Claims

[¶ 25] "A facial challenge to the constitutionality of a statute is a question of law subject to de novo review, and the party challenging the statute bears the burden of showing constitutional infirmity by strong and convincing reasons." *Town of Frye Island v. State,* 2008 ME 27, ¶ 13, 940 A.2d 1065, 1069.

[¶ 26] The equal protection clause of the Maine Constitution provides that "[n]o person shall ... be denied the equal protection of the laws...." Me. Const. art. I, § 6–A. The United States Constitution provides similarly, and the two clauses have been interpreted to provide co-extensive protection. *See* U.S. Const. amend. XIV, § 1; *Town of Frye Island,* 2008 ME 27, ¶ 14, 940 A.2d at 1069. We apply "a two-step test to determine whether a statute violates the equal protection clause. First, the party challenging the statute must show that similarly situated persons are not treated equally under the law." *Town of Frye Island,* 2008 ME 27, ¶ 14, 940 A.2d at 1069. If this step is met, we then determine what level of scrutiny to apply. *Id.* As FOLL concedes, the challenged legislation does not involve a fundamental right or a suspect class, so the test is whether the statute is rationally related to a legitimate state interest. *Id.*

[¶ 27] FOLL challenges the constitutionality of 38 M.R.S. §§ 344(2–A)(A)(1), 346(4). Section 344(2–A)(A)(1)

tive Sept. 12, 2009)).

provides, as an exception to the general rule at 38 M.R.S. §§ 341–D, 344(2–A)(A)(2009),[10] that the Commissioner must issue the decision and "may not request the [B]oard to assume jurisdiction of an application for any permit or other approval required for an expedited wind energy development." 38 M.R.S. § 344(2–A)(A)(1). FOLL argues that this unfairly precludes the Board from the opportunity to take over original jurisdiction of expedited wind energy development applications, leading to certain inequities, such as losing the presumption that the Board will hold a public hearing in the matter. *See* 2 C.M.R. 06 096 002–4 § 7(B) (2003).

[¶ 28] Section 346(4) provides that "[a] person aggrieved by an order or decision of the [B]oard or [C]ommissioner regarding an application for an expedited wind energy development . . . may appeal to the Supreme Judicial Court sitting as the [L]aw [C]ourt." 38 M.R.S. § 346(4). This statute is an exception to the general practice that persons aggrieved by an order or decision of the Board or Commissioner may appeal first to the Superior Court, and that a party to such appeal may then appeal the Superior Court's decision to this Court. 38 M.R.S. § 346(1), (2–A) (2009). FOLL argues that the direct appeal to us unfairly denies parties in expedited wind energy development matters the right to have the appeal heard first by the Superior Court, as occurs in most other administrative appeals.

[¶ 29] The wind power appeal statute is hardly unique. The Legislature has previously provided for direct appeal to this Court of other agency decisions in certain contexts. *See, e.g.,* 38 M.R.S.A. § 487

(Supp.1972) (providing appeals from a decision of the Environmental Improvement Commission under the Site Location of Development statute directly to this Court); *see also* 35–A M.R.S. § 1320(1), (6) (2009) (providing appeal from the Public Utilities Commission exclusively to this Court in certain situations). Although 38 M.R.S.A. § 487 was subsequently repealed, *see* P.L. 1977, ch. 300, § 34 (effective Oct. 24, 1977), we discussed that section with approval in several cases. *See, e.g., In re Belgrade Shores, Inc.,* 359 A.2d 59, 60–61 (Me.1976) (stating that appeal under section 487 was to this Court, observing also that "the right of appeal is not a constitutional right, but rather a legislative allowance subject to such restrictions, limitations and conditions as the Legislature may attach to it"); *King Res. Co. v. Envtl. Improvement Comm'n,* 270 A.2d 863, 870–71 (Me.1970).

[¶ 30] Assuming that FOLL has met its initial burden of showing, with respect to both sections 344(2–A)(A)(1) and 346(4), that applicants for expedited wind energy development (and therefore opponents of such applicants) are treated differently from similarly-situated applicants for other types of energy developments, *see Town of Frye Island,* 2008 ME 27, ¶ 14, 940 A.2d at 1069, FOLL has failed to show that no "conceivable state of facts either known, or which can reasonably be assumed, supports the legislative action," *see Aseptic Packaging Council v. State,* 637 A.2d 457, 459–60 (Me.1994). Though not required to do so, the Legislature has articulated a legitimate state interest in facilitating the rapid development of alternative, renewable energy resources. *See, e.g.,* 35–A

---

10. Generally, the Commissioner of the Department is to determine whether, pursuant to 38 M.R.S. §§ 341–D, 344(2–A)(A) (2009) the Board should assume jurisdiction over an application based on a determination that the application: (1) involves a policy, rule, or law that the Board has not previously interpreted;

(2) involves important, previously unresolved, policy questions; (3) involves important policy questions or legal interpretations that require reexamination; or (4) has generated substantial public interest. 38 M.R.S. § 341–D(2).

M.R.S. § 3402(1), (2) (2009);[11] *see also* Preamble to P.L. 2007, ch. 661. The provisions in 38 M.R.S. §§ 344(2–A)(A)(1), 346(4) that FOLL challenges are rationally related to a legitimate state interest and do not violate the Equal Protection Clauses of the United States and Maine Constitutions.

The entry is:

Judgment affirmed.

**11.** Title 35–A M.R.S. § 3402(2) (2009) provides:

The Legislature finds that it is in the public interest to reduce the potential for controversy regarding siting of grid-scale wind energy development by expediting development in places where it is most compatible with existing patterns of development and resource values when considered broadly at the landscape level. Accordingly, the Legislature finds that certain aspects of the State's regulatory process for determining the environmental acceptability of wind energy developments should be modified to encourage the siting of wind energy developments in these areas.