MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2014 ME 91
Docket:        BCD-13-487
Submitted
 On Briefs:    May 29, 2014
Decided:       July 15, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, SILVER, GORMAN, and JABAR, JJ.

DOUGLAS H. WATTS

v.

BOARD OF ENVIRONMENTAL PROTECTION et al.

GORMAN, J.

[¶1]  Douglas H. Watts appeals from a judgment entered in the Business and Consumer Docket (*Horton, J.*) affirming the decision of the Maine Board of Environmental Protection (BEP) approving S.D. Warren Co.'s application for water quality certification pursuant to section 401 of the Clean Water Act, 33 U.S.C.A. § 1341 (West, Westlaw through P.L. 113-120 approved 6-10-14), and Maine statute, 38 M.R.S. § 464(4)(F)(3) (2013).  We affirm the judgment.

## I.  BACKGROUND

[¶2]  Since at least 1827, a dam has existed at the outlet of Sebago Lake where Sebago Lake flows into the Presumpscot River.  The site is presently occupied by the Eel Weir Hydropower Project ("the project"), which is owned and operated by S.D. Warren Co.  The project encompasses the Eel Weir Dam, an

2

impoundment (Sebago Lake), a power canal and powerhouse, a tailrace channel, and associated infrastructure. The project also includes the Eel Weir Bypass, a 1.3-mile-long stretch of water that connects Sebago Lake to the Presumpscot River by circumventing the project facilities. Water flowing over the dam goes either to the power canal, where it is used to generate electricity, or to the bypass.[1]

[¶3] Pursuant to the Federal Power Act, the Federal Energy Regulatory Commission (FERC) is responsible for issuing licenses for the construction, operation, and maintenance of hydroelectric dams located in any navigable waters over which Congress has jurisdiction pursuant to the Commerce Clause of the United States Constitution. 16 U.S.C.A. §§ 797(e), 817(1) (West, Westlaw through P.L. 113-120 approved 6-10-14). Pursuant to section 401 of the Clean Water Act, any applicant for a license to conduct activity that "may result in any discharge into the navigable waters" must provide FERC with a certification from the state in which the discharge will originate confirming that any such discharge will comply with water quality standards established by the Clean Water Act and that state's statutes. 33 U.S.C.A. § 1341(a)(1); *see also S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶ 8, 868 A.2d 210, *aff'd*, 547 U.S. 370 (2006). FERC

---

[1] Warren owns and operates five other hydroelectric dams on the Presumpscot River below the Eel Weir Hydropower Project. *See S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶ 2, 868 A.2d 210, *aff'd*, 547 U.S. 370 (2006). The approval of water quality certification for those dams was the subject of a prior appeal by Warren to us. *See id.* ¶ 1. We affirmed the water quality certification, which required, among other things, the gradual installation of fish passages at Warren's other dams. *Id.* ¶ 1; *see also S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 375 (2006).

issued a twenty-year license for the project in 1984.[2]  In 2002 Warren began the process of relicensing the project and, as required, filed an application with the Maine Department of Environmental Protection (DEP) for approval of water quality certification ("WQC") in conjunction with the proposed relicensing.[3]

[¶4]  In August 2011, the DEP issued an order approving the WQC for the continued operation of the project.  That order included numerous conditions to ensure that the continued operation of the project would not violate applicable water quality standards for Sebago Lake and the Presumpscot River.  The conditions established minimum and maximum water flows into the Eel Weir Bypass, provided for eel passage around the Eel Weir Dam, and set an annual target lake level for Sebago Lake.  The WQC also included provisions specifically authorizing the DEP to reopen the certification in order to consider the installation of fish passage facilities around the dam and to modify Sebago Lake's water level. Douglas Watts, a recreational user of Sebago Lake and the Presumpscot River, appealed the WQC to the Board of Environmental Protection (BEP).  The BEP issued a decision affirming the DEP's order approving the WQC in November

---

[2]  The initial license issued by FERC did not contain conditions regarding the management of Sebago Lake's water level and did not require minimum water flows into the Eel Weir Bypass.  A 1992 FERC order established minimum water flow requirements regarding the bypass.  A 1997 FERC order, which was amended in 2000 and 2001, established a lake level management plan for Sebago Lake.

[3]  As is common practice, Warren voluntarily withdrew its first DEP application and refiled it several times as FERC continued to review its license application.  Warren's last filing was in 2011.

4

2012.[4] Watts then filed a petition for review in the Superior Court pursuant to M.R. Civ. P. 80C. The matter was transferred to the Business and Consumer Docket, and in October 2013 the court entered a judgment affirming the BEP's decision. Watts appealed to this Court.

## II. DISCUSSION

### A. Standard of Review

[¶5] When the Business and Consumer Docket acts in an intermediate appellate capacity pursuant to M.R. Civ. P. 80C, we review the BEP's decision directly for errors of law, abuse of discretion, or findings of fact not supported by the record. *See S.D. Warren Co.*, 2005 ME 27, ¶ 4, 868 A.2d 210. Our review of state agency decision-making is "deferential and limited." *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 12, 989 A.2d 1128. The BEP's interpretation of the statutes it administers "will be given great deference and should be upheld unless the statute plainly compels a contrary result." *S.D. Warren Co.*, 2005 ME 27, ¶ 4, 868 A.2d 210 (quotation marks omitted). We will affirm the BEP's findings of fact if they are supported by any competent

---

[4] Watts initially appealed the DEP's issuance of the WQC directly to the Superior Court, which remanded the matter to the BEP for consolidation with a separate appeal. The BEP did not hold any hearings on the consolidated appeals because members of the public had "attended meetings and submitted numerous comments" during the years the application was pending and because there was no "credible, conflicting technical evidence in the record that warrant[ed] . . . a hearing to gather additional information." Pursuant to 38 M.R.S. §§ 341-D(4) and 345-A(1-A) (2013), the BEP has discretion to hold hearings on matters under its consideration.

evidence in the record, even if the record contains inconsistent evidence or evidence contrary to the result reached by the BEP. *Friends of Lincoln Lakes*, 2010 ME 18, ¶¶ 13-14, 989 A.2d 1128. As the party seeking to vacate the BEP's decision, Watts bears the burden of persuasion on appeal. *Id.* ¶ 15.

B.    The Water Quality Certification

[¶6]  Watts's primary contention on appeal is that the WQC fails to comply with Maine's water quality standards governing the Eel Weir Bypass and Sebago Lake. Maine's water quality standards designate uses and related characteristics for each class of water and prescribe numeric and narrative criteria to protect those uses and characteristics. *See generally* 38 M.R.S. §§ 464-470 (2013)[5]; *Bangor Hydro-Elec. Co. v. Bd. of Envtl. Prot.*, 595 A.2d 438, 442 (Me. 1991). With respect to fresh surface waters that are not classified as great ponds, Maine law creates a hierarchy of water quality in which Class AA is the highest, followed by Classes A, B, and C. *See* 38 M.R.S. § 465 (2013).[6] The Presumpscot River immediately below the Eel Weir Dam, including the Eel Weir Bypass, is a Class A water. 38 M.R.S. § 467(9)(A)(1) (2013).

---

[5]  Maine's water classification program is set forth at 38 M.R.S. §§ 464-470 (2013). Some of the relevant statutes have been amended since Warren began its license application in 2002, but not in any way dispositive to this appeal. *See, e.g.*, P.L. 2003, ch. 227, §§ 1-9 (effective Sept. 13, 2003) (codified at 38 M.R.S. §§ 465 to 465-B (2013)).

[6]  Maine's water quality standards also contain the federally required anti-degradation policy. *See* 38 M.R.S. § 464(4)(F) (2013); 40 C.F.R. § 131.12 (2014).

6

> Class A waters must be of such quality that they are suitable for the designated uses of drinking water after disinfection; fishing; agriculture; recreation in and on the water; industrial process and cooling water supply; hydroelectric power generation, except as prohibited under Title 12, section 403; navigation; and as habitat for fish and other aquatic life. The habitat must be characterized as natural.

38 M.R.S. § 465(2)(A) (2013).  Sebago Lake is classified as GPA (Great Pond A):

> Class GPA waters must be of such quality that they are suitable for the designated uses of drinking water after disinfection, recreation in and on the water, fishing, agriculture, industrial process and cooling water supply, hydroelectric power generation, navigation and as habitat for fish and other aquatic life. The habitat must be characterized as natural.

38 M.R.S. § 465-A(1)(A) (2013).  The term "natural," as it is used in 38 M.R.S. §§ 465(2)(A) and 465-A(1)(A), is defined as "living in, or as if in, a state of nature not measurably affected by human activity."  38 M.R.S. § 466(9) (2013).

[¶7]  Watts contends that the water quality certification issued by the DEP fails to comply with these water quality standards in two ways: first, by failing to ensure the existence of self-sustaining populations of landlocked Atlantic salmon in the Eel Weir Bypass, and second, by establishing water levels for Sebago Lake that Watts considers to be too high.  We address each contention in turn.

1.      Landlocked Atlantic Salmon in the Eel Weir Bypass

[¶8]  The landlocked Atlantic salmon is Maine's state fish.  Maine Secretary of State, State Fish – Landlocked Salmon, http://maine.gov/sos/kids/about/symbols/fish.htm (last visited July 11, 2014).  Unlike anadromous fish species such as alewives or sea-run Atlantic salmon that migrate from the ocean to fresh water to spawn, "resident" species like the landlocked Atlantic salmon live their entire lives in freshwater lakes and rivers.  To support a popular fishery at the Eel Weir Bypass, the Maine Department of Inland Fisheries and Wildlife (MDIFW) stocks the bypass with landlocked salmon, as well as brook trout and brown trout.  During the application review process, MDIFW requested that the WQC continue to provide for a cap on the amount of water that flows into the bypass during the landlocked salmons' spawning season in the fall, and that the WQC not provide for fish passage between Sebago Lake and the bypass.  Although these restrictions on fish movement inhibit the landlocked salmons' ability to reproduce in the bypass, MDIFW considers the restrictions necessary to support its fish stocking program and to support salmon fishing in Sebago Lake and the bypass.  The WQC ultimately incorporated a fall outflow cap and did not provide for fish passage between the lake and the bypass.

[¶9]  Watts argues that the WQC violates Maine's Class A water quality standards because those standards mandate that landlocked salmon in Sebago Lake

8

have free access to and from the Presumpscot River. Watts asserts that the WQC, by limiting the reproduction of landlocked salmon in the bypass, fails to provide for a "natural" habitat in the bypass as required by 38 M.R.S. §§ 465(2)(A) and 466(9). The BEP directly addressed Watts's contentions in its order, and stated:

> Nothing in the State's water quality standards necessarily requires installation of fish passage at all dams or that all populations of indigenous species be self-sustaining, without regard to the particular circumstances of the waterbody. Rather, Class GPA and Class A water quality standards require that waters must be of such quality that they are suitable for the designated use of habitat for fish and other aquatic life, with the *habitat* characterized as natural, and of sufficient quality to support all indigenous species. The evidence in the record supports a finding that if the Project is operated as proposed, the water quality conditions in both Sebago Lake and the Presumpscot River, including the Eel Weir Bypass, will support indigenous species of fish and aquatic life and therefore meet applicable habitat and aquatic life water quality standards.

[¶10] We defer to the BEP's determination that the WQC satisfies the requirement that the habitat of the bypass be characterized as "natural," that is, "living in, or as if in, a state of nature not measurably affected by human activity." 38 M.R.S. § 466(9); *see also S.D. Warren Co.*, 2005 ME 27, ¶ 4, 868 A.2d 210 ("The [BEP]'s interpretation of a statute administered by it, while not conclusive or binding on this court, will be given great deference and should be upheld unless the statute plainly compels a contrary result." (quotation marks omitted)). The definition of "natural" as "living in, *or as if in*, a state of nature not measurably

affected by human activity" allows for a range of habitat conditions that may be deemed "natural" while simultaneously accounting for the various designated uses of Class A waters. 38 M.R.S. § 466(9) (emphasis added). These designated uses include not only habitat for fish and other aquatic life, but also fishing, recreation, agriculture, drinking water supply, and hydroelectric power generation. 38 M.R.S. § 465(2)(A). Because the statute "contemplates that the designated uses actually be present," *Bangor Hydro-Elec. Co.*, 595 A.2d at 442, the BEP properly determined that the WQC should provide for all designated uses of the bypass, including "natural" habitat, despite the absence of a self-sustaining salmon population.

[¶11] The remainder of Watts's contentions regarding the Eel Weir Bypass largely amount to policy preferences about how the habitat of the bypass should be managed. In reviewing the BEP's decision, we do not weigh the merits of evidence or substitute our judgment for that of the agency. *See Friends of Lincoln Lakes*, 2010 ME 18, ¶¶ 12, 14, 989 A.2d 1128.[7] Because the BEP did not err in

---

[7] For example, Watts contends that the water quality certification, by providing for eel (but not fish) passage around the dam, creates an unlawful subcategory of Class A standards. This contention fails to recognize that competent evidence demonstrates that the documented presence of eels above and below the dam requires passage. Further, the WQC includes a provision that allows the DEP to reopen the certification for consideration of fish passage facilities if circumstances so require. Although Watts relies on some of our precedent as well as a letter from the EPA to the Maine Attorney General, these authorities are inapposite to the present case and generally support the BEP's decision. *See Save Our Sebasticook, Inc. v. Bd. of Envtl. Prot.*, 2007 ME 102, ¶¶ 13-35, 928 A.2d 736 (affirming the BEP's cost-benefit analysis regarding the removal of a dam and its determination that state water quality standards would be met by removal); *S.D. Warren Co.*, 2005 ME 27, ¶¶ 4-31, 868 A.2d 210 (deferring to

interpreting the statutes relating to its regulatory authority, and because its factual findings are supported by competent evidence in the record, we affirm the BEP's decision with respect to the water quality certification of the Eel Weir Bypass. *See S.D. Warren Co.*, 2005 ME 27, ¶¶ 4, 22 n.10, 868 A.2d 210.

### 2. Sebago Lake's Water Levels

[¶12] Watts next contends that the BEP erred in approving the provisions of the WQC regarding Sebago Lake's water levels because the WQC does not ensure a "natural" habitat in the lake as required of Class GPA waters. 38 M.R.S. §§ 465-A(1)(A), 466(9). In its discussion of the lake's water levels, the BEP directly addressed Watts's contention:

> The Board finds that, contrary to Appellant Watts'[s] assertion, the standards for Class GPA waters require *habitat* not *lake levels* to be natural. That is, water quality standards do not require that a lake level be equivalent to the lake levels that existed prior to construction of the impounding dam. The Department's interpretation of Class GPA water quality standards is consistent with the plain language of

---

the BEP's determination that dams owned by Warren required water quality certification because the operation of the dams may result in a discharge, and affirming the BEP's imposition of conditions necessary to meet water quality standards); *Bangor Hydro-Elec. Co. v. Bd. of Envtl. Prot.*, 595 A.2d 438, 442-43 (Me. 1991) (concluding that the BEP may properly consider the designated uses of a body of water in reviewing whether water quality standards are met); Letter from Stephen S. Perkins, Director, Office of Ecosystem Protection, United States EPA Region 1, to William J. Schneider, Maine Attorney General (July 9, 2012) (informing the Maine Attorney General that a since-repealed Maine statute that prevented river herring from entering Class A and AA portions of the St. Croix River violated Maine water quality standards). Watts also contends that the water quality certification fails to meet the "unimpaired" standard for Class B waters pursuant to 38 M.R.S. § 465(3)(A) (2013). The parties agree that the Class A standard governing the bypass necessarily includes the lower Class B standard. Because the BEP did not err in determining that the WQC meets the Class A standard, though, there is no need to discuss Watts's contentions regarding the "unimpaired" standard. We find Watts's remaining contentions, including his argument that the WQC violates the statute's anti-degradation provision, 38 M.R.S. § 464(4)(F), to be without merit and do not address them separately.

the statute, the fact that hydroelectric power generation is a designated use of GPA waters, and the Board's long-standing interpretation of the State's water quality standards.

We agree with the BEP's interpretation and application of the law.

[¶13]  Watts's remaining contentions regarding Sebago Lake's water levels are again based primarily on Watts's preferences for how the lake should be managed.  He has failed to demonstrate either that the BEP erred in interpreting the applicable statutes or that its factual findings were not supported by competent evidence.  *See S.D. Warren Co.*, 2005 ME 27, ¶¶ 4, 22 n.10, 868 A.2d 210.  Contrary to Watts's arguments, the BEP properly construed and applied the water quality standards for Class GPA waters while balancing the lake's designated uses, which include recreation, fishing, agriculture, hydroelectric power generation, drinking water supply, and habitat for fish and other aquatic life.  38 M.R.S. § 465-A(1)(A); *see Bangor Hydro-Elec. Co.*, 595 A.2d at 442-43.

[¶14]  We therefore affirm the BEP's decision with respect to the water level management of Sebago Lake.

The entry is:

Judgment affirmed.

12

**On the briefs:**

Douglas H. Watts, pro se appellant

Janet T. Mills, Attorney General, and Gerald D. Reid, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee Board of Environmental Protection

Matthew D. Manahan, Esq., and Catherine R. Connors, Esq., Pierce Atwood, LLP, Portland, for appellee S.D. Warren Co.

Business and Consumer Docket docket number AP-2013-01
FOR CLERK REFERENCE ONLY