STATE OF MAINE                                    SUPERIOR COURT

Cumberland, ss.

**STATE OF MAINE**
**Cumberland ss. Clerk's Office**

**SEP 08 2016**

ROBERT HUDSON

Petitioner                          **RECEIVED**

v.                                              Docket No. PORSC-AP-16-03

MAINE PUBLIC EMPLOYEES RETIREMENT SYSTEM

Respondent

## DECISION AND JUDGMENT

Pursuant to Rule 80C of the Maine Rules of Civil Procedure, Petitioner Robert Hudson has appealed from a decision of the Board of Trustees ["Board"] of the Maine Public Employees Retirement System ("MPERS") denying his application for disability retirement benefits. The parties have filed briefs and the administrative record.

The Clerk scheduled the appeal for oral argument to be held September 6, 2016 on the understanding that counsel were requesting it, but on the morning of September 6, the court was advised that counsel were prepared to waive oral argument if the court agreed. Accordingly, the case is decided on the basis of the parties' briefs and the record.

For the reasons set forth below, the court affirms the Board's decision, denies the appeal and grants judgment to the Respondent.

I.      Background

a.  Employment and Medical History

Appellant Robert Hudson is 54 years old and lives in Raymond, Maine. (R. at 38.6). Mr. Hudson was employed by the Maine Department of Corrections (MDOC) from 1991 to 2012, most recently as a Correctional Trades Supervisor. (R. at 38.6.)

1

As a State employee, Mr. Hudson was a member of the State Employee and Teachers Retirement Program. *See* 5 M.R.S. § 17651 (all State employees and teachers mandated to be members of the State Employees and Teachers Retirement Program as a condition of employment).

Mr. Hudson's job as a Correctional Trades Supervisor entailed training, supervising and assisting inmates involved in various work situations, as well as assessing the quality of the work being performed. (R. at 38.6). Furthermore, the job required Mr. Hudson to spend three to four hours driving per day, sometimes with inmates in the car with him. (R. 38.6.) In that position, Mr. Hudson was expected to respond to emergency situations that might involve restraining inmates. (R. at 38.6.) Mr. Hudson was considered a "very good employee and a very hard worker" by his supervisor.

In April of 2008, Mr. Hudson told his primary care physician, Carl Schuler, D.O., that he was experiencing "spells" during which he would lose his train of thought and get confused. (R. at 38.7.) Mr. Hudson reported that these spells were happening three to four times per year and seemed to be getting worse. (R. at 38.7.) Dr. Schuler believed that these spells might have been migraines or seizures and ordered a CAT scan and referred Mr. Hudson to Maine Neurology. (R. at 38.7.) On April 23, 2008, Georgann Dickey, MS, ANP, at Maine Neurology, diagnosed Mr. Hudson with "transient alteration of awareness," and noted that his symptoms "do not neatly fit into diagnostic criteria for migraine aura, seizures or ischemia." (R. at 38.7.)

From 2008 until his episode in 2012, there was no mention of Mr. Hudson's spells in his medical records. Mr. Hudson acknowledges that his health care providers

never put restrictions on his employment as a result of the spells. (R. 15.107). Mr. Hudson did not request any accommodation while employed by the MDOC. (R. at 38.7.)

On June 26, 2012, Mr. Hudson became confused and exhibited odd behavior at work. (R. at 4.67, 4.86, 4.164, 38.7). He was taken to the emergency room at Maine Medical Center, where Megan Selvitelli, M.D. found that Mr. Hudson's "history is suggestive of a focal onset seizure with secondary generalization, likely due to the demonstrated left frontal meningioma," i.e. that his symptoms were associated with what proved to be a benign tumor of the brain. (R. at 38.7.) Mr. Hudson was prescribed Keppra, an anticonvulsant, and told not to drive until he had three months without any seizures, or if he chose not to take the anticonvulsant, for six months of "seizure freedom". (R. at 4.136-38, 38.7.) Mr. Hudson left the emergency room against medical advice. (R. at 38.7.)

On July 10, 2012, Mr. Hudson reported to Patricia Seely, NP-C, at Maine Neurology that he was experiencing excessive sleepiness, dark moods and severe lapses in memory, and was concerned that he would not he able to work while taking Keppra. On July 12, 2012, Ms. Seely ordered Mr. Hudson "out of work until further notice," and advised that Mr. Hudson "is unable to drive and requires further testing and medical treatment at this time." (R. at 38.7.)

Mr. Hudson's last day of work was June 25, 2012, and his last date in service was July 17, 2012, when he went on unpaid leave. (R. at 38.6). His employment was terminated on September 8, 2013. (R. at 38.6).

Effective August 1, 2012, Mr. Hudson's medication was changed from Keppra to Trileptal. On August 3, 2012, two days after the medication change, Mr. Hudson experienced a "seizure cluster". (R. at 38.8.) According to Mr. Hudson's later

3

testimony, the seizures on August 3, 2012, were the last he experienced. (R. at 15.76-77). On August 7, 2012, Dr. Selvitelli noted that Mr. Hudson switched back to taking Keppra. (R. at 38.8.) On September 18, 2012, Mr. Hudson saw Jason Aucoin, RN, ANP-C, a certified adult nurse practitioner in Dr. Selvitelli's office at Maine Neurology who assessed Mr. Hudson to have generalized convulsive epilepsy. (R. at 38.8.) Nurse practitioner Aucoin noted that the meningioma was unlikely to increase in size and that as long as the anticonvulsants are effective in controlling Mr. Hudson's seizures, Mr. Hudson "should not have complications" with regards to the meningioma. (R. at 9.53, 38.8.)

In the notes from the same visit, nurse practitioner Aucoin stated that since switching back to the Keppra, Mr. Hudson has not had any additional seizures. Mr. Hudson reported that he was "doing well on the Keppra with much less side effects" and "that he feels almost normal now on the Keppra."(R. at 9.53, 38.8.)

The record contains a note from Dr. Selvitelli indicating that Mr. Hudson had reported experiencing a seizure October 8, 2012, and placing him on a driving restriction until January 2013. (R. at 9.63).

On January 28, 2013, Dr. Selvitelli noted that Mr. Hudson continued to report "possible seizures" and discussed transitioning to an alternative anticonvulsant, which Mr. Hudson declined. (R. at 9.56, 38.8.) However, notes from Mr. Hudson's April 2, 2013 appointment with nurse practitioner Aucoin state that Mr. Hudson's "last known seizure" was when he transitioned off Keppra in 2012, and that Mr. Hudson's reported symptoms were more consistent with a depression diagnosis than with seizures. (R. at 9.58, 38.8).

4

Mr. Hudson saw Amy McAuliffe, Ph.D., a psychiatric nurse practitioner with the Department of Veteran's Affairs on February 27, 2013. She noted that Mr. Hudson "continues to experience profound disabling symptoms of major depression and generalized anxiety disorder versus PTSD" and that "Mr. Hudson experiences "severe depression and anxiety with phobic avoidance of driving." (R. at 38.8.) As a result of conducting a psychiatric evaluation of Mr. Hudson on March 27, 2013, Dr. McAuliffe diagnosed Mr. Hudson with "Major Depression, mod-sev vs. Organic Mood Disorder." (R. at 38.8.) Dr. McAuliffe noted that the location of Mr. Hudson's meningioma, in the left frontotemporal region, "can certainly be associated with such symptoms of affect dysregulation and unpredictability" that Mr. Hudson was experiencing and that there was a "specific precipitant to [Mr. Hudson's] depressive symptoms," and identified possible "severe psychological stressors," including vocational, financial and social stressors. (R. at 38-9.)

On April 16, 2013, Carlyle Voss, M.D. evaluated Mr. Hudson by interviewing Mr. Hudson, reviewing his medical records, and reviewing the findings of the Medical Board discussed below. (R. at 38.9.) Dr. Voss diagnosed Mr. Hudson with Adjustment Disorder of Adult Life with Mixed Symptoms of Anxiety and Depression. (R. at 38.9.) Dr. Voss found that Mr. Hudson's seizures were in partial control and that Mr. Hudson was experiencing "stressors related to illness and related to impairments, inability to work, [and] financial pressures." (R. at 38.9.) Dr. Voss found Mr. Hudson's current GAF to be 45, which he characterized as "serious symptoms (emotional liability, cognitive impairment)."(R. at 38.9.) Dr. Voss's opinion was that: 1) Mr. Hudson's meningioma caused his seizures; 2) Mr. Hudson experienced significant impairments, including "sub threshold seizures," due to a combination of the side effects of the Keppra

5

and the direct effects of his meningioma and related seizures; 3) an anticonvulsant other than Keppra might better control Mr. Hudson's sub threshold seizures without adverse side effects; 4) Mr. Hudson is not "pervasively depressed" and does not require antidepressant medication; and 5) Mr. Hudson might be able to drive safely if he were taking different anticonvulsant medication. (R. at 38.9.) Dr. Voss concluded that because of Mr. Hudson's significant impairments, "even on his best days he could not perform the essential functions of his job."(R. at 38.9.)

b. Medical Board Findings

The MPERS Medical Board reviewed the record on September 20, 2012, again on August 22, 2013 in response to Mr. Hudson's Addendum, and a third time on October 24, 2013, following the hearing. (R. at 38.9.)

On September 20, 2012, the Medical Board found that the record supports the existence of the benign meningioma. (R. at 38.9.) The Medical Board also found that the record confirmed the existence of seizures, but not of uncontrolled seizures. (R. at 38.9-10). The Medical Board found that there were no functional limitations associated with Mr. Hudson's brain tumor. (R. at 38.10.) The Medical Board did find that there were functional limitations to the seizures associated with the tumor, including restrictions on driving, operating machinery and climbing ladders, but that, because those restrictions would be lifted after three seizure free months, those limitations were not expected to be permanent.

On August 22, 2013, the Medical Board found that a diagnosis of adjustment disorder of adult life as was raised in Mr. Hudson's addendum, was not made until well after July 17, 2012, Mr. Hudson's last date in service. (R. at 38.10.) The Medical Board affirmed its earlier determination that the limitations associated with Mr. Hudson's

6

seizures were not permanent because Mr. Hudson had not had a seizure in more than three months. (R. at 38.10.) In addition, the Medical Board found that Mr. Hudson's spells were psychogenic, not seizure related and that his brain tumor was stable. (R. at 38.10.)

On October 24, 2013, the Medical Board decided that none of the new evidence proved that Mr. Hudson's adjustment disorder existed before his last date in service and affirmed their determination with regards to Mr. Hudson's brain tumor and seizures. (R. at 38.10.)

c.  Procedural history

Mr. Hudson applied for disability retirement benefits through the Maine Public Employees Retirement System (MPERS) on August 4, 2012, based on the meningioma and associated seizures. (R. at 38.3.)  On September 26, 2012, the Executive Director's Designee (EDD) issued a decision denying Mr. Hudson's application. The EDD found that medical evidence did not support the existence of uncontrolled seizures as of Mr. Hudson's last date in service, and that there were no functional limitations associated with the condition of brain tumor that made it impossible for Mr. Hudson to perform the essential functions of his job as of his last day in service. (R. at 38.3.) The EDD found that medical evidence supported the existence of seizures, rather than uncontrolled seizures, but that the functional limitations associated with seizures were not expected to be permanent as of July 17, 2012. (R. at 38.3.) Mr. Hudson filed a timely appeal on October 16, 2012. (R. at 38.3.)

Mr. Hudson filed an addendum to his application on July 1, 2013 along with supporting medical records, seeking eligibility based upon the condition of adjustment disorder of adult life with mixed symptoms of anxiety and depression/major depression.

7

On August 26, 2013, the EDD issued a decision finding that the record did not establish that Mr. Hudson had adjustment disorder of adult life with mixed symptoms of anxiety and depression/major depression as of his last date of service. (R. at 38.4.) The EDD also found that the functional limitations previously attributed to Mr. Hudson's seizures had resolved and were not permanent. (R. at 38.4.) The EDD affirmed the September 26, 2012 decision.

A hearing was held on September 4, 2013. According to Mr. Hudson's testimony at the September 4 hearing, he had not experienced a seizure since August 3, 2012, but was then experiencing muscle fatigue and pain, dizziness, mental confusion, sleep disruption, and difficulties with speech, focusing, and keeping his train of thought, frequent emotional breakdowns, including mood swings, crying and sudden anger outbursts. (R. at 15.76-77, 38.8.) Mr. Hudson testified that there are no legal restrictions on his driving, but that he does not feel safe doing so because of the possibility that he might have another seizure. (R. at 38.8.)

At the hearing, Mr. Hudson argued that the EDD erred when she denied Mr. Hudson's application based on adjustment disorder of adult life with mixed symptoms of anxiety and depression/major depression. He also argued that, under Chapter 501 of the MPERS rules, *see* 94-411 C.M.R. ch. 501, he was entitled to disability benefits because his psychiatric condition arose out of the spells and other symptoms he was experiencing while still working. On October 30, 2013, after the hearing, and before a decision was issued, the EDD issued a decision affirming the September 26, 2012 and August 26, 2013 decisions despite the additional argument provided by Mr. Hudson. On April 23, 2014, the hearing officer remanded to the EDD for a final decision on the

8

applicability of Chapter 501. On May 6, 2014, the EDD issued an order concluding that Chapter 501 was inapplicable to Mr. Hudson's case.

A Recommended Decision was issued for comments February 24, 2015. (R. at 38.4.) On March 12, 2015, Mr. Hudson submitted comments arguing that the EDD should have followed the Board's decision in a prior disability appeal—that of Paul G. Jackson. (R. at 38.4.) The hearing officer found that the Jackson appeal was distinguishable and unpersuasive in the matter at hand. The hearing officer's Recommended Final Decision was issued August 28, 2015, affirming the determination of the EDD. (R. at 38.14.) After hearing oral argument, the Board adopted the hearing officer's Recommended Final Decision on December 16, 2015. It is from the Board's decision that this appeal was timely taken.

## II.    Issues on Appeal

Appellant Hudson raises several issues on appeal:

First, he contends that the evidence presented to MPERS compels the conclusion that he is eligible for disability retirement benefits. He asserts that the Board ignored the medical evidence, mainly from Dr. Voss and psychiatric nurse practitioner McAuliffe, as well as his own and his wife's testimony and other evidence establishing his eligibility for benefits, and failed to consider the evidence of his medical conditions, separately and in combination with each other.

He asserts that the Board erred as a matter of law by failing to follow its rules contained in Chapter 501(1) of the MPERS rules.

He asserts that the Board failed to follow its own precedent, as reflected in the decision on the appeal of Paul G. Jackson. *See* Appeal of Jackson, MPERS Bd. App. No. 2013-007 (Oct. 12, 2013).

9

Appellant Hudson asks that the Board's denial of benefits be vacated and that the matter be remanded with an order to grant benefits.

Respondent MPERS denies all of the Appellant's contentions and asks the court to deny the appeal and affirm the Board's decision.

### III.    Standard of Review

The court's review of an action for administrative appeal is "deferential and limited." *Watts v. Bd. of Envtl. Prot.*, 2014 ME 91, ¶ 5, 97 A.3d 115. The court only reviews adjudicatory decisions "for abuse of discretion, errors of law, or findings not supported by the substantial evidence in the record." *Wyman v. Town of Phippsburg*, 2009 ME 77, ¶ 8, 976 A.2d 985. The court will "not vacate an agency's decision unless it: violates the Constitution or statutes; exceeds, the agency's authority; is procedurally unlawful; is arbitrary or capricious; constitutes an abuse of discretion; is affected by bias or an error of law; or is unsupported by the evidence in the record." *Kroeger v. Department of Environmental Protection*, 2005 ME 50, ¶ 7, 870 A.2d 566.

The party seeking to vacate the agency's decision bears the burden of persuasion. *Town of Jay v. Androscoggin Energy, LLC*, 2003 ME 64, ¶ 10, 822 A.2d 1114. If the agency's decision was committed to the reasonable discretion of the agency, the party appealing has the burden of demonstrating that the agency abused its discretion in reaching the decision. *See Sager v. Town of Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567. "An abuse of discretion may be found where an appellant demonstrates that the decision maker exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Id.* Ultimately, the petitioner must prove that "no competent evidence" supports the agency's decision. *Seider v. Board of Examiners of Psychologists*, 2000 ME 206, ¶ 9, 762

10

A.2d 551 (*citing Bischoff v. Board of Trustees*, 661 A.2d 167, 170 (Me. 1995)). The mere fact that there is "[i]nconsistent evidence will not render an agency decision unsupported." *Id.*

IV.   Discussion

a.   Burden to Prove Eligibility for MPERS Disability Retirement Benefits

By statute, a member of the State Employee and Teacher Retirement Program, as Mr. Hudson was, becomes eligible for disability retirement benefits if the person becomes "disabled" while in service. 5 M.R.S. § 17924(1).   To be considered "disabled," an MPERS member must be mentally or physically incapacitated, such as that the incapacity renders it impossible to perform the duties of the member's job and is expected to be permanent. *Id.* § 17921(1).   Mr. Hudson's brief acknowledges that he has the burden of persuasion to prove by a preponderance of the evidence that he is eligible for benefits. *See Douglas v. Board of Trustees*, 669 A.2d 177, 179 (Me. 1996). *See also* 94-411 C.M.R. ch. 507, § 2(A); *id.* ch. 509, § 2(A).

b.   Applicability of MPERS Rules Chapter 501

A threshold question is whether the Board applied the wrong standard in evaluating Mr. Hudson's claim for disability retirement benefits.   Mr. Hudson points to an MPERS rule that permits benefits to be awarded, not only if the disability existed at the time the member last worked, but also "arose out of or was substantially aggravated by the illness or injury for which the leave was granted." 94-411 C.M.R. ch. 501, § 1.[1]

---

[1]  The section reads in full as follows:

> Any active member of the Maine State Retirement System who is in service may apply for a disability retirement benefit.  Included in the category of active members are persons who are working at the time of filing a disability retirement application, or who are on a leave of absence with pay from which retirement contributions continue to be deducted, or who are on a leave of

11

Noting the evidence that his psychiatric condition arose out of the meningioma condition that existed when he last worked in 2012, Mr. Hudson contends that applying the rule of Chapter 501 compels a decision in his favor.

MPERS's argument is two-fold. First, MPERS points out that Chapter 501 does not apply to Mr. Hudson. According to its basis statement, Chapter 501's application is limited to "persons who were members of the M.S.R.S. prior to July 1, 1977." 94-411 C.M.R. ch. 501, § 4. MPERS additionally points out that even if Chapter 501 were deemed applicable to Mr. Hudson's claim, the governing statute, 5 M.R.S. § 17924, is plainly inconsistent with the rule and necessarily would preempt the rule. Both points are valid, and the court defers to the agency's interpretation of regulations promulgated by the agency. *Imagineering, Inc. v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991); *Kennebec County v. Me. Public Employees Retirement System*, 2014 ME 26, ¶ 33, 86 A.3d 1204.

The hearing officer and the MPERS Board did not err in deciding that the Chapter 501 standard for a covered disability does not apply.

c. The Respondent's Evaluation of the Evidence

As a preliminary matter, it must be noted that, because Mr. Hudson had the burden of persuasion, the MPERS Board's decision to deny his claim for benefits based on his failure to meet his burden cannot be overturned unless the record compels the conclusion that he did prove that he is entitled to benefits. to the contrary. *See Anderson v. Maine Public Employees Retirement System*, 2009 ME 134, ¶3, 985 A.2d 501

---

absence without pay for illness or injury or recuperation from illness or injury, providing that the disability which is the basis for the member's application existed at the time the member commenced the leave of absence or arose out of or was substantially aggravated by the illness or injury for which the leave was granted.

12

("When an appellant had the burden of proof before the agency, and challenges an agency finding that it failed to meet that burden of proof, we will not overturn the agency fact-finding unless the appellant demonstrates that the administrative record compels the contrary findings that the appellant asserts should have been entered.")

Here, a review of the evidence before the hearing officer and the MPERS Board leads the court to conclude that, although there certainly was evidence that could have supported a decision in favor of Mr. Hudson's claim, had the hearing officer and the Board viewed and weighed the evidence differently, the evidence did not compel the hearing officer or the Board to find in his favor.

The evidence showed that at the time Mr. Hudson left the State's employ, he was at least temporarily unable to perform his duties as a result of the benign brain tumor and associated seizures. Based on evidence that Mr. Hudson's seizures were being treated with medication, and that he had not experienced any seizures since August 3, 2012, shortly after he last worked for the State, MPERS decided that he had not proved that the disabling condition that caused him to leave work was expected to be permanent.

Mr. Hudson argues that the functional limitations caused by the risk of seizures amount to a permanent and disabling condition. The evidence is admittedly contradictory as to whether Mr. Hudson experienced any seizures after August 3, 2012, in part because the evidence is based on his own reports to health care providers. However, the evidence does not compel a finding that either the meningioma itself or the seizures that were associated with it have caused any permanent incapacity or functional limitation.

13

While the Board did find that Mr. Hudson had functional limitations that restricted him from performing his job immediately after his episode at work on June 26, 2012, the Board found that these limitations were expected to end within a matter of months, after which Mr. Hudson would be able to perform all necessary aspects of his job, including driving. Plainly, the weight of the evidence suggests that the seizures are being controlled by medication. Thus, the evidence did not by any means compel a finding that the risk of seizures is such as to impose any permanent functional limitation.

Mr. Hudson contends that the board erred by finding that Mr. Hudson did not suffer from adjustment disorder and major depression at the time of his last day in service and is therefore ineligible for disability benefits based upon that diagnosis. He contends that his depression and anxiety resulted directly from his brain tumor and seizure disorder, and that MPERS erred in not finding that the depression and anxiety were disabling conditions present on Mr. Hudson's last in service date.

However, as the State points out in response, the applicable statute requires that the disability exist as of the claimant's last day "in service," meaning his last day of work for which he was paid, *see Douglas v. Board of Trustees, supra,* 669 A.2d at 179, and the evidence does not compel a finding that Mr. Hudson's psychiatric disability, assuming it is a disability within the meaning of the MPERS statutes, existed as of July 2012. The first diagnosis by a medical professional of his psychiatric condition dates to February 2013, seven months later.

Although Mr. Hudson's own testimony and other evidence could have supported a decision in his favor, neither the hearing officer nor the Board was compelled to give his evidence the weight that he claims it should have received. Because the evidence in

14

the record does not compel a decision contrary to the decision on appeal, Mr. Hudson's contentions regarding the evidence do not justify overturning the Board's decision.

The court agrees with the Board that the issues involved in the prior decision in the appeal of Paul G. Jackson are distinguishable from the issues in this case. In the Jackson appeal, the issue was whether the claimant's incapacity resulting from a knee condition was expected to be permanent, and the claimant's own primary care provider testified that it was permanently disabling. The evidence in this case is different, and the Board did not err by coming to a different conclusion in this case.

Lastly, the court also agrees with the Board that this case must be decided under the applicable statutory provisions and that the principles of common law and equity that the Petitioner invokes cannot be applied in a manner contrary to the statutes.

## V.  Conclusion

For the reasons given above, it is hereby ORDERED AND ADJUDGED as follows:

1. The Petitioner's appeal is denied. The decision of the Respondent MPERS Board of Trustees to deny Petitioner's claim is affirmed. Judgment is hereby entered for the Respondent, with recoverable costs, if any, as the prevailing party.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this order by reference in the docket.

Dated 8 September 2016

_A. M. Horton_
A. M. Horton
Justice, Superior Court

15