STATE OF MAINE                          SUPERIOR COURT
SAGADAHOC, ss.                          CIVIL ACTION
                                        DOCKET NO. AP-16-04

RANDY BODGE,                    )
                                )
        Petitioner              )
                                )
v.                              )       ORDER ON
                                )       MOTION TO RECONSIDER
MAINE PUBLIC EMPLOYEES          )
RETIREMENT SYSTEM,              )
                                )
        Respondent              )

The Petitioner's Motion to Reconsider is DENIED. As noted by the Respondent in its opposition to the motion, whether or not to hold oral argument is left to the discretion of the court[1]. In matters of this type, the court's consideration is limited to the record and the law. The matter was well briefed and the law is well established. After consideration of the briefs and the record, the court concluded that oral argument would not assist the court in resolving this matter.

Date: May 31, 2017

Daniel I. Billings
Justice, Maine Superior Court

---

[1] By issuing a decision on the petition without oral argument, the court has otherwise directed that oral argument will not be conducted, as allowed by Rule 80C.

1

STATE OF MAINE                              SUPERIOR COURT
SAGADAHOC, ss.                              CIVIL ACTION
                                           DOCKET NO. AP-16-04

RANDY BODGE,                    )
                               )
          Petitioner           )
                               )
v.                             )            ORDER ON
                               )            80C PETITION
MAINE PUBLIC EMPLOYEES         )
RETIREMENT SYSTEM,             )
                               )
          Respondent           )


This matter is before the Court on Petitioner Randy Bodge's Rule 80C appeal of the final decision of the Board of Trustees (the "Board") of the Maine Public Employees Retirement System ("MainePERS") to deny Petitioner's application for disability retirement benefits. Petitioner contends that the record evidence compels a finding contrary to the Board's decision.

## I. BACKGROUND

### A. Procedural History

On July 9, 2013, Petitioner applied to MainePERS for disability retirement benefits on the basis of carcinoid tumor.[1] On September 6, 2013, MainePERS' Executive Director denied Petitioner's application after finding that there were no functional limitations associated with Petitioner's carcinoid tumor, and therefore Petitioner's condition did not make it impossible to perform the essential duties of his position. Petitioner appealed.

In December 2013, Petitioner filed an application addendum raising two new conditions for consideration: anxiety and severe depression. On January 6, 2014, the Executive Director

---

[1] Petitioner also applied on the basis of Lyme disease but later dismissed that claim.

1

issued a decision finding that Petitioner suffered from neither anxiety nor severe depression as of June 26, 2013, and otherwise affirming her September 2013 decision.

In March 2014, due to an agreement between Petitioner and his employer, Petitioner's final date of service changed from June 26, 2013 to November 13, 2013.

An administrative hearing on Petitioner's appeal was held April 18, 2014. The hearing officer identified the following issues for consideration: (1) "whether the medical evidence establishes functional limitations associated with the carcinoid tumors that make it impossible for [Petitioner] to perform the essential duties of his job as of the last date in service" and (2) "with respect to the condition of anxiety and depression . . . whether that condition exists as of the last date in service of November 13th of 2013." Petitioner testified at the hearing. Petitioner's oncologist, G. Richard Polkinghorn, M.D., was deposed on May 21, 2014, and his deposition was included in the hearing record.

On September 5, 2014, the Executive Director issued a third decision affirming the September 2013 and January 2014 decisions in light of the change in Petitioner's last date of service.

Between the April 18, 2014 hearing and early September, 2014, a new hearing officer was assigned to Petitioner's case, prompting Petitioner to move to begin the appeal process anew. On October 16, 2014, the hearing officer denied in part Petitioner's motion to begin anew and granted it in part by agreeing to hold a second hearing in order to personally assess Petitioner's credibility and ask Petitioner questions. The hearing was held on January 28, 2015.

On August 28, 2015, the hearing officer issued a Recommended Decision for Comments denying Petitioner's application. Petitioner submitted comments on September 14, 2015. On February 24, 2016, the hearing officer issued (1) a response to Petitioner's comments and (2) his

2

Recommended Final Decision for the Board. As indicated by the hearing officer's response to Petitioner's comments, the Recommended Final Decision is substantially similar if not identical to the Recommended Decision for Comments.

On March 3, 2016, Petitioner requested a review pursuant to System Rule 7012(16) and 5 M.R.S. § 17106-A ("section 17106-A review".) Petitioner included with his request for review his comments on the hearing officer's Recommended Final Decision. On March 28, 2016, counsel for the Board issued the section 17106-A review, finding that the hearing officer's Recommended Final Decision contained no errors of law, was supported by the record as a whole, and did not exceed the hearing officer's authority or jurisdiction.

On June 9, 2016, the Board issued its Final Decision adopting and attaching the hearing officer's Recommended Final Decision.

MainePERS mailed its Final Decision to Petitioner on June 20, 2016. Petitioner filed the pending petition for review on July 14, 2016.

### B. Medical and Employment History

The following facts, which are supported by competent evidence in the record, are drawn from the Recommended Final Decision issued by the hearing officer and adopted by the Board as its Final Decision (the "Decision"). See *Jalbert v. Me. Pub. Emples. Ret. Sys.*, 2017 ME 69, ¶ 11, ___ A.3d ___.

Petitioner was employed by the Maine Department of Transportation (the "MDOT") for over 20 years, eventually working his way from a laborer position on a bridge maintenance crew to a management position overseeing several bridge maintenance and operation crews throughout the State. (R. 54.3, 7.) Petitioner's job generally required him to spend one day a week in the office and four days a week driving to various work sites, "where he evaluated the

3

work, supervised the work, addressed any personnel issues and provided technical advice." (R. 54.7.) He testified that he would "often 'travel several hundred miles a day if need be.'" (R. 54.11.) Further, when visiting sites, he "had to walk down the [bridge] slide slope to view the work and occasionally climb on staging." (R. 54.7.) However, Decision also states that "[t]here were no physical requirements in the job." (R. 54.7.)

In early 2013, Petitioner was diagnosed with cancer in the form of an abdominal carcinoid tumor.[2] (R. 54.3, 7-8.) On February 20, 2013, surgeons removed a portion of the tumor, along with a portion of Petitioner's small bowel, but found that the remainder of the tumor was inoperable. (R. 54.8.) On March 11, 2013,[3] Petitioner was seen by oncologist G. Richard Polkinghorn, M.D., who informed Petitioner that the recommended course would be observation unless the disease progressed or become symptomatic, in which case he would likely recommend Sandostatin treatment. (R. 54.8.) On May 28, 2013, Petitioner was seen by Matthew H. Kulke, M.D., at the Dana Farber Cancer Institute in Boston for a second opinion. (R. 54.11.) Dr. Kulke's notes indicate that Petitioner reported experiencing diarrhea and flushing. (R. 54.11.) Petitioner returned to work in April 2013. (R. 54.3.)

Petitioner was next seen by Dr. Polkinghorn on June 10, 2013, and reported that he was suffering from diarrhea, hot flashes, and mood changes. (R. 54.8.) Tests revealed that Petitioner's chromogranin-A level was high, and Dr. Polkinghorn scheduled Petitioner to begin monthly injections of Sandostatin. (R. 54.8.) When Petitioner returned to begin Sandostatin treatment on June 14, 2013, he complained of "severe anxiety, racing mind, and poor performance at work." (R. 54.8.) Dr. Polkinghorn prescribed Petitioner Ativan and in his notes

_____

[2] At times the record suggests that Petitioner has multiple carcinoid tumors clumped together as opposed to one singular carcinoid tumor. The discrepancy is not remarked upon by the parties and does not appear to be relevant to Petitioner's application or appeal.
[3] The Decision erroneously lists the year as 2015. (R. 54.8.)

4

described Petitioner's anxiety as "multifactorial including diagnosis of cancer as well as stresses at work and apparently at home." (R. 54.8.) Petitioner returned again on June 17, 2013, at which time he complained of flushing, diarrhea, and "significant anxiety." (R. 54.8.)

Despite these reported symptoms, Petitioner worked full-time and did not request any job modifications, although "there was evidence that he was receiving some assistance from subordinates in order to fully perform his job duties." (R. 54.11, 12, 14.) Petitioner would later testify that he abstained from taking his prescribed pain medication and other medications while he was working "as he needed to drive, etc." (R. 54.11.)

On June 26, 2013, Petitioner was placed on unpaid leave for disciplinary reasons. (R. 54.3, 7, 12, 14.) Petitioner initiated a grievance and requested reinstatement. (R. 54.3, 7, 12, 14.) The grievance was settled in 2014. (R. 54.3, 7, 12, 14.) Pursuant to the settlement Petitioner's termination was rescinded and he resigned effective November 13, 2013. (R. 54.3, 7, 12, 14.)Petitioner's last day in service for the purposes of his disability retirement benefit application was therefore changed to November 13, 2013. (R. 54.3, 7, 12, 14.)

On July 10, 2013, Petitioner was seen by Susan C. Trafton, PA-C, for "refractory diarrhea, flushing . . . sweating post prandially." Petitioner also reported "intermittent nausea without vomiting," "generalized body pain," "difficulty with minimal sleep due to mental tension and anxiety," and "a history of anxiety predating his malignancy." (R. 54.8.) On July 15, 2013, Petitioner was seen by Dr. Polkinghorn, who noted that Petitioner suffered from "[s]evere weakness [and] fatigue related to malignancy . . . . complicated by significant anxiety[ and] depression, also likely related to his underlying malignancy in the stress of his loss of current health." (R. 54.9.) Dr. Polkinghorn also indicated that Petitioner's prescriptions included lorazepam and Restoril. (R. 54.9.) On July 17, 2013, Petitioner was seen by his primary care

5

physician, Donald Strickland, M.D., who noted that "a good day" for Petitioner was "six or fewer episodes of urgent diarrhea" but a "normal day is 12 or more episodes." (R. 54.10.) Dr. Strickland added that Petitioner "has not been able to work because of this" and that Petitioner felt "fatigued" and "depressed." (R. 54.10.) He prescribed Petitioner Wellbutrin. (R. 54.10.)

On September 9, 2013, Petitioner was seen by Dr. Polkinghorn, who noted that Petitioner's "chromogranin-A levels had normalized," and "blood work was excellent," but that Petitioner "remain[ed] quite symptomatic," with symptoms including "significant diarrhea, weakness, fatigue, [and] anxiety." (R. 54.9.) On September 18, 2013, Petitioner began treating with clinical psychologist David Houston, Ph.D., who noted that Petitioner "felt anxious and depressed in the context of the diagnosis of carcinoid tumor," and diagnosed Petitioner with general anxiety disorder and major depressive disorder. (R. 54.13.)

On a October 7, 2013 medical intake form, Petitioner reported hot flashes and night sweats that "seem[ed] to be increasing," daily abdominal pain, nausea, and "continuous diarrhea." (R. 54.15.) Under "Ability to cope," he selected the following symptoms: "depression, Anxious, Suicidal thoughts, sleep disturbance, [and] memory loss." (R. 54.15.) He then wrote: "[t]he anxiety and memory loss seem to be more often in therapy." (R. 54.15.) On October 22, 2013, Petitioner was seen by Dr. Strickland for chest pain and depression. Dr. Strickland believed the chest pain to be "non cardiac related" and noted that the Wellbutrin seemed to be helping Petitioner's depression. (R. 54.10.)

On a November 5, 2013 medical intake form, Petitioner reported "[h]eavy sweating, weight loss, appetite: up and down, ongoing shortness of breath, nausea, severe diarrhea and daily abdominal pain." (R. 54.16.) He added, "[t]reating depression but it still occurs, short term memory loss is increasing. Anxiety being treated but not controlled." (R. 54.16.)

6

Although he had not worked in four and a half months, November 13, 2013, was Petitioner's last date of service. (R. 54.14.)

On December 3, 2013, Petitioner was seen by Dr. Polkinghorn, who noted that Petitioner's cancer was stable but that Petitioner still reported experiencing diarrhea. (R. 54.9.) Dr. Polkinghorn referred Petitioner to a gastroenterologist for diarrhea management. (R. 54.9.) Also on December 3, 2013, Petitioner was seen by Dr. Strickland, who noted, "I think what would help [Petitioner's depression] is getting out of the house, more socializing, routine exercise, but all of that is difficult given his present medical situation." (R. 54.10.) On December 20, 2013, psychiatrist Mitchell Pulver, M.D., wrote, "I think that [Petitioner] has major depression brought on by his health problems," and indicated that he had prescribed Petitioner Zoloft. (R. 54.10.)

At the April 2014 administrative hearing, Petitioner testified that he had diarrhea six to eight times a day and that "it was getting progressively worse." (R. 54.12.) He also testified "that he had not had mental health treatment prior to the cancer diagnosis but was seeing Dr. Pulver, a psychiatrist, Dr. H[o]uston a psychologist[,] and a counselor, Allison Basile," and also that he "saw Carol Maxwell once or twice a week." (R. 54.12.) He testified that although he requested reinstatement in June 2013 and had not requested any job modifications, he also "knew he could not do the job," "did not have the energy to work," "could not do the hours," "could not drive with the medications that he was prescribed," and "could not work due to headaches, concentration and decision making [being] impaired." (R. 54.12.)

At Dr. Polkinghorn's May 2014 deposition, when "asked to reconcile an earlier letter he wrote asserting that [Petitioner] could not perform the duties of his job with contrary evidence that he was performing his job up to June 2013," Dr. Polkinghorn responded, "[m]y opinion was

7

that given the symptoms he was sharing with us, that it would be virtually impossible for someone to have as much symptoms as he was relating to be able to be fully active and perform a job." (R. 54.16.)

At the January 2015 hearing, Petitioner testified that his monthly Sandostatin treatments "were extremely painful and made him sick for seven to ten days" after each treatment, but also that he never missed work following treatment. He also testified "that he realized 2-3 weeks after his return to work after his surgery that he could not do the job. He said that he could not handle the stress, and the physical climbing and the length of his work day. He did, however, continue to work until he was terminated . . . ." (R. 54.11.)

### C. Medical Board Findings

The MainePERS Medical Board reviewed the record and issued findings on three occasions: first on September 5, 2013, next on January 2, 2014, in response to Petitioner's application addendum, and finally on September 4, 2014, in response to the change in Petitioner's last date of service.

On September 5, 2013, the Medical Board found that following his February 2013 surgery, Petitioner had returned to work "full duty on a full-time basis without apparent significant difficulty," and that that although Petitioner's medical records indicated that he "was having some difficulty with diarrhea 6-8 times daily, there [was] no indication within the records provided that functional limitations were warranted regarding carcinoid tumors (cancerous) as of June 26, 2013." (R. 54.12-13.)

8

On January 2, 2014, the Medical Board wrote that although on July 17, 2013, Petitioner's primary care physician[4] noted that Petitioner felt fatigued and depressed, the physician's notes "did not document symptoms and signs fully consistent with an anxiety disorder and depressive disorder per DSM IV criteria." (R. 54.13.) With regard to Petitioner's diagnoses of general anxiety disorder and major depressive disorder, the Medical Board found that Dr. Houston,[5] who made the diagnoses, "did not clearly delineate signs and symptoms fully consistent with either of these conditions in his notes." (R. 54.13.)

On September 4, 2014, the Medical Board wrote that although Petitioner "continued to complain of significant diarrhea, fatigue and flushing," his laboratory results were "unremarkable, and physical examinations [had] not revealed evidence of significant difficulties." (R. 54.13.) Furthermore, although Petitioner's treating physicians "alleged that [Petitioner] has no work capacity due to his condition," they "offered no information to confirm these assertions." (R. 54.13.) The Medical Board concluded that Petitioner's medical records did not "support the presence of functional limitations as of November 13, 2013." (R. 54.13.) In addition, the Medical Board again concluded, "the records [did] not clearly support the existence of anxiety and severe depression as of November 13, 2013." (R. 54.13.)

**D. The Decision**

In the Decision adopted by the Board, the hearing officer outlined the above facts and made the following conclusions:

The hearing officer determined that (1) Petitioner was able to perform his job duties in June 2013, (2) Petitioner's symptoms were not significantly worse in November 2013 than they

---

[4] The Medical Board mistakenly refers to Petitioner's primary care physician as "Dr. Rice" but correctly quotes Dr. Strickland's notes from his July 17, 2013 appointment with Petitioner. (R. 4.216, 11.3.)

[5] The Medical Board misspells Dr. Houston's last name as "Huston." (R. 54.13.)

9

were in June 2013, and (3) Petitioner therefore was able to perform his job duties as of his last date of service in November 2013. Specifically, the hearing officer wrote,

> Although I am sympathetic to [Petitioner's] willingness to work through such pain and discomfort that may have felled a lesser man . . . the fact remained he performed his employment duties. The burden is upon [Petitioner] to prove by a preponderance of the evidence that due to his cancer he had functional limitations that made it impossible to perform the essential duties of his job. He has not done so.
>
> The symptoms he had in June, 2013 when he still performed his job duties were not significantly worse in November, 2013 and although Dr. Polkinghorn stated that it would be "difficult" for [Petitioner] to work, the fact remained that [Petitioner] overcame those difficulties and worked until his removal for unrelated conduct issues.

(R. 54.17 (emphasis in original).) The hearing officer concluded that Petitioner did not meet his burden of proving "that on his last date of service, November 13, 2013 he had functional limitations that made it impossible to perform the essential functions of his job" (R. 54.17.) The hearing officer did not reach the issue of whether Petitioner's condition was expected to be permanent.

With regard to Petitioner's claim on the bases of anxiety and severe depression, the hearing officer found that Petitioner "did not meet the required factors that would support a major depressive disorder or an anxiety disorder." (R. 54.17.) The hearing officer added, "[d]espite some counseling and medication to treat [Petitioner's] anxiety and depression, the criteria have not been spelled out by his various practitioners. All of the providers link his depression and anxiety to his cancer diagnosis and treatment." (R. 54.17.) The hearing officer concluded that Petitioner had not met his burden of proving "that the medical evidence established the existence of anxiety and/or depression as of November 13, 2013." (R. 54.17.) The hearing officer did not reach the issues of whether Petitioner's alleged anxiety and severe

10

depression made it impossible for Petitioner to do his job or whether they were expected to be permanent.

## II. STANDARD OF REVIEW

The court's review of an action for administrative appeal is "deferential and limited." *Watts v. Bd. of Envtl. Prot.*, 2014 ME 91, ¶ 5, 97 A.3d 115 (quoting *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 12, 989 A.2d 1128). The court reviews administrative decisions for "abuse of discretion, errors of law, or findings not supported by substantial evidence in the record." *Wyman v. Town of Phippsburg*, 2009 ME 77, ¶ 8, 976 A.2d 985 (quoting *Griswold v. Town of Denmark*, 2007 ME 93, ¶ 9, 927 A.2d 410). To prevail, the challenging party must prove that "no competent evidence" supports the agency's decision. *Seider v. Bd. of Examiners of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551 (citing *Bischoff v. Bd. of Trustees*, 661 A.2d 167, 170 (Me. 1995)). "Inconsistent evidence will not render an agency decision unsupported." *Id.*

## III. DISCUSSION

In order to qualify for a disability retirement benefit, Petitioner was required to prove that "while in service," he had mental or physical incapacity that was "expected to be permanent" and that made it "impossible to perform the duties of [his] employment position." 5 M.R.S. §§ 17921(1), 17924(1)(A)-(B) (2013); *Jalbert v. Me. Pub. Emples. Ret. Sys.*, 2017 ME 69, ¶ 11, ___ A.3d ___.

Petitioner argues that his medical records "provide[] clear and unequivocal evidence that [he] was unable to work in any capacity" on his last date of service. (Pet'r's Br. 14.) Petitioner cites medical records showing that from March 2013 to February 2014 he reported "problems with constant diarrhea, breathing, bowels, ability to move, nervous system, vision and heart," as

11

well as "incapacitating nausea, vomiting, abdominal pain, joint pain and swelling, hot flashes, and loss of appetite," and that on a scale from one to ten, he consistently reported a pain level of around six or seven. (Pet'r's Br. 11.)

Petitioner also emphasizes the difficulty of his job as a bridge maintenance manager, calling it "stressful, complex, time consuming, and physically demanding." (Pet'r's Br. 15-16.) He contends that his "[f]requent diarrhea, stomach aches and nausea would disrupt work days," cause him to make frequent stops while on the road, and cause "overwhelming disruption to his work duties and responsibilities" at inspection sites. (Pet'r's Br. 16.) Petitioner states that the record is "replete . . . with [his] frequent loss of memory and concentration," which he describes as "a problem in technical field work, and office work as well," adding that such loss of concentration "would also be extremely detrimental to his physical inspection of bridges as it could lead to an oversight on a bridge that needs immediate repair." (Pet'r's Br. 16.) Petitioner further states that the record "has . . . amply demonstrated [his] loss of appetite, weight loss, and resulting loss of strength and increasing fatigue and malaise," and contends that "lack of strength would pose a serious issue in the field." (Pet'r's Br. 16.) He adds that his headaches "would . . . exacerbate the distractions caused by his anxiety and physical limitations," and he that "he would be unable to take the medications necessary to dull his pain as [the medications] would affect his ability to drive." (Pet'r's Br. 16.)

In response, MainePERS reiterates the findings of the Medical Board and the hearing officer and points to record evidence not included in the Decision, including the following:

- Although Dr. Polkinghorn wrote in February 2014 that "due to illness" Petitioner could not have worked prior to June 26, 2013, he testified at

deposition that he did not recall that Petitioner had been working, apparently without difficulty, prior to June 26, 2013.[6] (Resp.'s Br. 10 (citing R. 25.39).)

- Dr. Polkinghorn also testified that his February 2014 opinion was based not on objective tests but rather on Petitioner's own reporting, and that it would have been "virtually impossible" for someone with the symptoms Petitioner reported to "be fully active and perform a job." (Resp.'s Br. 10 (citing R. 25.39-41).)

- Although Dr. Polkinghorn testified that Petitioner's diarrhea was solely related to his tumor, another physician who saw Petitioner, Robert P. Dohner, D.O., "believed the diarrhea was related to anxiety and not from the carcinoid tumors."[7] (Resp.'s Br. 11 (citing R. 20.432).)

- Petitioner was treated for headache in 2010, 2011, and 2012, and "there is no evidence linking [Petitioner's] headaches to condition of carcinoid tumor," noting that Petitioner was treated for headaches in 2010, 2011, and 2012. (Resp.'s Br. 11 (citing R. 4.24, 34; 20.109).)

- In addition to there being "no medical evidence to corroborate" the existence of Petitioner's alleged "flushing," "hot flashes, "sweating," or "chest pain and respiratory system attacks," let alone the severity or duration of these

---

[6] Dr. Polkinghorn testified at his May 2014 deposition that he could not recall whether he knew in February 2014 that Petitioner had worked until June 26 2013. (R. 25.38-39.)

[7] Dr. Dohner saw Petitioner on September 3, 2013, and stated in his notes under "HISTORY OF PRESENT ILLNESS" that Petitioner "has had progression of his illness to include significant flushing and diarrhea" and that Petitioner "report[ed] exacerbations of anxiety that seem to fuel the frequency of loose stools." (R. 20.432.)

13

symptoms, Dr. Dohner found that they improved with Petitioner's monthly Sandostatin treatments.[8] (Resp.'s Br. 12 (citing R. 20.433).)

Petitioner replies that "[a]rguing that one could work because one has worked would preclude a favorable decision for any employee." (Pet'r's Reply Br. 2.) According to Petitioner, "[t]he conclusion that [he] could not work in November, 2013 is amply supported in the medical records." (Pet'r's Reply Br. 2 (citing R. 20.205-19).)

The Court agrees with MainePERS' reasoning that because Petitioner was able to do his job despite his cancer symptoms until he was placed on leave for misconduct in June 2013, Petitioner had to prove that his symptoms worsened over the next four and a half months to the extent that he could not possibly overcome them as he had before. Although there is evidence in the record to support such a finding, there is also evidence to the contrary, including (1) the opinion of the Medical Board,[9] (2) the fact that the much of the evidence is based on Petitioner's own reports of symptoms as opposed to objective examinations, and (3) Dr. Polkinghorn's September 9, 2013 report indicating Petitioner's blood tests were normal. The Board duly weighed all of the evidence in the record and determined within its discretion that Petitioner failed to meet his evidentiary burden.

"When an agency concludes that the party with the burden of proof failed to meet that burden, we will reverse that determination only if the record compels a contrary conclusion to the exclusion of any other inference." *Kelley v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 27, ¶ 16, 967

---

[8] On September 3, 2013, Dr. Dohner stated in his notes under "ASSESSMENT" that Petitioner "has had persistent and progressive symptomatology of diarrhea, anxiety, and flushing which has improved with Sandostatin . . . . Despite improvement, the patient still reports life-limiting symptoms of flushing and diarrhea which are exacerbated by anxiety." (R. 20.433.)

[9] *See Anderson v. Me. Pub. Emps. Ret. Sys.*, 2009 ME 134, ¶ 28, 985 A.2d 501 (the presence in the record of a medical board report questioning applicant's evidence meant that the record did not compel a finding that applicant had met her burden of proof.)

14

A.2d 676 (quoting *Hale-Rice v. Me. State Ret. Sys.*, 1997 ME 64, ¶ 17, 691 A.2d 1232). Because the record does not compel a contrary conclusion, the Court affirms the Board's Decision.

### Anxiety and Severe Depression

Petitioner argues that the record evidence as a whole compelled the Board to find that his he suffered from depression and severe anxiety as of November 13, 2013. Petitioner notes that "[a]t the time of the hearing, he was taking Lorazepam and Temazepam for depression and anxiety" and also that he "worked with Carol Maxwell at the Alfond Center for Cancer Care, and he received referrals for specialist mental health care with Dr. Mitch Pulver, David H[o]uston, Ph.D. and Allison Basile LCPC." (Pet'r's Br. 12 (citing R. 61; 20.81-83.) According to Petitioner, "there is nothing in this record which contradicts the view of his treating providers that [he] suffers from major mental health disorders that Dr. Houston, Ph.D. diagnosed as generalized anxiety disorder and major depression." (Pet'r's Br. 12.)

MainePERS counters that the Medical Board found that Petitioner's providers "failed to document symptoms consistent with anxiety or depressive disorder as outlined in the DSM-IV" and that the hearing officer agreed with the Medical Board. According to MainePERS, "[o]n this basis alone, [Petitioner] failed to meet his burden of proof." (Resp.'s Br. 13.) MainePERS goes also cites record evidence suggesting that Petitioner's apparent anxiety and depression stemmed directly from his carcinoid tumor. (Resp.'s Br. 13 (citing R. 4.185; 20.49, 73, 109; 25.16).) MainePERS also argues that "[e]ven if anxiety and depression were proven to exist as separate diagnosable conditions, there is scant evidence to demonstrate functional limitations." (Resp.'s Br. 14.) In addition, according to MainePERS, Petitioner's alleged inability to drive when taking certain medications is deemed irrelevant by Petitioner's testimony that he abstained from those medications when working in order to be able to drive. (Resp.'s Br. 14.) In a footnote,

15

MainePERS adds that Petitioner's "ability to work without medication is further evidence that it was not impossible for him to do his job." (Resp.'s Br. 14, n.4.)

Although the record suggests that Petitioner did suffer from depression and anxiety, the record as a whole does not compel a finding contrary to the Board's conclusion that Petitioner failed to meet his burden of proof in that regard. In particular, the Medical Board's opinion and the possibility that Petitioner's psychological symptoms stemmed from his cancer diagnosis are sufficient to support the Board's finding. For this reason, the Court affirms the Board's Decision.

## IV. CONCLUSION

In light of the foregoing, The Board's decision is AFFIRMED.

Date: May 10, 2017

Daniel I. Billings
Justice, Maine Superior Court

16